UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————

UNITED STATES OF AMERICA,            )
                                     )
          - v. -                     )
                                     )    22 Cr. 518 (PKC)
OLEG VLADIMIROVICH DERIPASKA,        )    ORAL ARGUMENT REQUESTED
et al.,                              )
                                     )
                Defendants.          )
                                     )

—————————————————————

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## NATALIA BARDAKOVA'S MOTION TO DISMISS

Dated: November 3, 2023           MORVILLO ABRAMOWITZ
       New York, New York         GRAND IASON & ANELLO, P.C.
                                  Robert J. Anello
                                  Brian A. Jacobs
                                  Courtney D. Morphet
                                  565 Fifth Avenue
                                  New York, NY 10017
                                  Tel: (212) 856-9600

                                  *Attorneys for Defendant*
                                  *Natalia Bardakova*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 3

STANDARD OF REVIEW ............................................................................................... 5

ARGUMENT ..................................................................................................................... 6

   I.   The Court Should Dismiss Count Three Because Venue Is Improper in this District ........ 6

     A.   Venue Is Improper in the Southern District of New York Because the Allegedly Criminal Conduct Occurred Exclusively in California During an In-Person Interview.. 6

     B.   Venue Is Improper in the Southern District of New York Because the Case Fails the Substantial Contacts Test ............................................................................................. 8

   II.   The Court Should Dismiss Count One Because It Violates Due Process ............................ 9

   III.   The Court Should Dismiss Count One Because the Vast Majority of the Alleged Conduct Is Exempted from the IEEPA, and the De Minimis Remaining Conduct Cannot Support the Charge ................................................................................................................. 13

   IV.   The Court Should Address this Motion On the Merits Notwithstanding Ms. Bardakova's Absence from the District ........................................................................................... 16

CONCLUSION .............................................................................................................. 23

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bouie v. City of Columbia,*
    378 U.S. 347 (1964) ............................................................................... 10

*Boyce Motor Lines v. United States,*
    342 U.S. 337 (1952) ................................................................................. 5

*Collazos v. United States,*
    368 F.3d 190 (2d Cir. 2004) .................................................................. 18

*Empire Blue Cross & Blue Shield v. Finkelstein,*
    111 F.3d 278 (2d Cir. 1997) .................................................................. 17

*In re Hijazi,*
    589 F.3d 401 (7th Cir. 2009) ................................................................. 20

*Marland v. Trump,*
    498 F. Supp. 3d 624 (E.D. Pa. 2020) .................................................... 15

*Nen Di Wu v. Holder,*
    646 F.3d 133 (2d Cir. 2011) .................................................................. 21

*Open Soc'y Justice Initiative v. Trump,*
    510 F. Supp. 3d 198 (S.D.N.Y. 2021) ................................................... 15

*Rubin v. Garvin,*
    544 F.3d 461 (2d Cir. 2008) .................................................................. 10

*TikTok Inc. v. Trump,*
    507 F. Supp. 3d 92 (D.D.C. 2020) ........................................................ 15

*United Stated v. Al Kassar,*
    660 F.3d 108 (2d Cir. 2011) .................................................................. 13

*United States v. Abdalla,*
    839 F. App'x 656 (2d Cir. 2021) ........................................................... 13

*United States v. Alfonso,*
    143 F.3d 772 (2d Cir. 1998) ................................................................... 5

*United States v. Al-Moayad,*
    545 F.3d 139 (2d Cir. 2008) .................................................................. 10

*United States v. Bescond*,
   24 F.4th 759 (2d Cir. 2021) .................................................................................... *Passim*

*United States v. Bin Laden*,
   146 F. Supp. 2d 373 (S.D.N.Y. 2001) ........................................................... 6, 7

*United States v. Cabrales*,
   524 U.S. 1 (1998) ......................................................................................... 6, 7

*United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012) ............................................................................. 8

*United States v. Cornelson*,
   595 F. Supp. 3d 265 (S.D.N.Y. 2022) ................................................. 17, 20, 21

*United States v. Davis*,
   905 F.2d 245 (9th Cir.1990) ................................................................... 13, 16

*United States v. Harriss*,
   347 U.S. 612 (1954) ..................................................................................... 10

*United States v. Kalichenko*,
   840 F. App'x 644 (2d Cir. 2021) .................................................................. 13

*United States v. Lanier*,
   520 U.S. 259 (1997) ..................................................................................... 12

*United States v. Miller*,
   808 F.3d 607 (2d Cir. 2015) ........................................................................... 8

*United States v. Noriega*,
   683 F. Supp. 1373 (S.D. Fla. 1988) ............................................................. 22

*United States v. Ramirez*,
   420 F.3d 134 (2d Cir. 2005) ........................................................................... 8

*United States v. Saavedra*,
   223 F.3d 85 (2d Cir. 2000) ............................................................................. 8

*United States v. Shapiro*,
   391 F. Supp. 689 (S.D.N.Y. 1975) ............................................................... 17

*United States v. Sindzingre*,
   2019 WL 2290494 (E.D.N.Y. May 29, 2019) ............................................... 21

*United States v. Smith*,
   641 F.3d 1200 (10th Cir. 2011) ................................................................... 6

*United States v. Stephenson*,
   895 F.2d 867 (2d Cir. 1990) .................................................................. 1, 6

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) ............................................................................ 2, 22

*United States v. Williams*,
   553 U.S. 285 (2008) ................................................................................ 10

*United States v. Yousef*,
   327 F.3d 56 (2d Cir. 2003) .............................................................. 13, 16

**Statutes**

18 U.S.C. § 1001 ....................................................................................... 9

50 U.S.C. § 1702(b) ........................................................................... 11, 14

**Rules**

Fed. R. Crim. P. 12(b)(3) ................................................................. 1, 2, 5

**Regulations**

31 C.F.R. § 589.201 ........................................................................... 11, 12

Exec. Order No. 13660 ............................................................................. 3

## PRELIMINARY STATEMENT

Defendant Natalia Bardakova has been charged with federal crimes for assisting other individuals in purchasing things like flowers, t-shirts, and iPhones, and helping to make arrangements for another woman to give birth in California.  She never should have been charged in this case, and the Indictment should be dismissed.  Indictment 22 Cr. 518 (PKC) (the "Indictment") charges Ms. Bardakova in Count One and Count Three with, respectively, conspiracy to violate the International Emergency Economic Powers Act ("IEEPA") and making false statements.[1]  Both counts are defective:  The false statements count charges conduct for which venue is improper here, and the IEEPA conspiracy count charges conduct that is non-criminal, took place largely outside the United States, and is exempt from the relevant law.  *See* Indictment ¶¶ 23-25, 28-29.

The Court should dismiss the false statements charge in Count Three because venue is not proper in the Southern District of New York, where the relevant conduct all took place in California.  *See* Fed. R. Crim. P. 12(b)(3)(A)(i).  The Indictment alleges that Ms. Bardakova made the supposed false statements after FBI agents stopped her "at the Los Angeles airport" and "accompanied" her "back to her hotel where they interviewed her in the lobby."  Indictment ¶ 22.  Venue in a false statements case is proper where the false statements are "completed."  *See United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990).  Because the Indictment itself alleges that the statements here were "completed" in California, and because substantial contacts with New York are otherwise lacking, venue cannot be laid in the Southern District of New York.

---

[1] Counts Two and Four of the Indictment do not charge Ms. Bardakova.

The Court also should dismiss Count One's IEEPA conspiracy charge because the vast majority of Ms. Bardakova's alleged conduct relates to making arrangements for a non-sanctioned person to give birth in the United States, and criminalizing this innocent activity violates the due process requirement of fair notice. Due process also bars the government from relying on Ms. Bardakova's other alleged conduct outside of the United States (such as supposedly playing a role in flower and t-shirt deliveries) because due process protects against the extraterritorial application of the law to such acts. In addition, the Court should dismiss Count One because the vast majority of Ms. Bardakova's alleged conduct is exempted under the relevant regulations, which permit acts relating to travel and personal maintenance, and the few remaining allegations cannot save the Indictment. *See* Fed. R. Crim. P. 12(b)(3)(B)(v).

Finally, although Ms. Bardakova has not appeared in this Court to face the instant charges, she nevertheless is entitled to make this motion to dismiss pursuant to well-established Second Circuit law, insofar as she is a foreign citizen who lives abroad, and she did not flee the charges. *See United States v. Bescond*, 24 F.4th 759, 771-75 (2d Cir. 2021). The Fifth Amendment's due process protections, which Ms. Bardakova is invoking here, are so fundamental that they apply to foreign defendants, such as Ms. Bardakova. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 278 (1990) (Kennedy, J., concurring) (noting that when "[t]he United States is prosecuting a foreign national in a court established under Article III, . . . [a]ll would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant"). Ms. Bardakova's alleged conduct also is not remotely nefarious, let alone criminal. Rather, as alleged in the Indictment, Ms. Bardakova's relevant activities include making arrangements for another woman to give birth in the United States, and participating in deliveries of items, such as flowers and t-shirts.

2

Accordingly, this Court should consider this motion on the merits and dismiss Counts One and Three.

<u>**STATEMENT OF FACTS**</u>

As alleged in the Indictment, Ms. Bardakova is a Russian national who purportedly worked for co-defendant Oleg Deripaska, and was present within the United States on just a handful of days in mid-2022. Indictment ¶¶ 4, 19(j), and 19(k). The Indictment does not specify the precise nature of Ms. Bardakova's supposed employment by Mr. Deripaska, but asserts that between April 2018 and 2022, Ms. Bardakova supposedly provided Mr. Deripaska with certain "services" relating to "gift deliveries" and the birth and planned birth of two children in the United States by Ms. Voronina, who was not sanctioned, but whom allegedly was carrying his children. *Id.* ¶ 4.

During the time period when Ms. Bardakova allegedly was providing these so-called "services," the Indictment alleges Ms. Bardakova knew Mr. Deripaska was the subject of OFAC sanctions pursuant to Executive Orders 13661 and 13662 (together, with Executive Order 13660, the "Ukraine-Related Executive Orders"). *See id.* ¶¶ 1, 4, 10, 14, 18. In particular, the Indictment asserts, Mr. Deripaska was subject to sanctions prohibiting the "making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked, and the receipt of any contribution or provision of funds, goods, or services from any such person." *See id.* ¶ 8 (citing Executive Order 13660).

Among the purported "services" Ms. Bardakova supposedly provided to Mr. Deripaska, the Indictment alleges that she "instructed" her co-defendant, Olga Shriki, "to purchase and send flower and gift deliveries on behalf of DERIPASKA to DERIPASKA's social contacts in the

United States and Canada," including "Easter gift deliveries to a U.S. television host," "two flower deliveries to a then-former Canadian Parliament member," and "two flower deliveries in 2020" to co-defendant Ekaterina Olegovna Voronina (who was not sanctioned). *Id.* ¶ 19(b). Ms. Bardakova also allegedly "instructed SHRIKI to purchase items in the United States for DERIPASKA's personal use, such as iPhones and clothing." *Id.* ¶ 19(c). The Indictment describes how Ms. Bardakova allegedly exchanged messages with Ms. Shriki regarding 10 extra-large American Eagle branded t-shirts, which the Indictment insinuates but does not explicitly allege was for Mr. Deripaska. *Id.*

Beyond providing assistance with the purchases of things like t-shirts, the Indictment alleges that Ms. Bardakova and Ms. Shriki together "facilitated arrangements for VORONINA to give birth to DERIPASKA's child in the United States," including by "coordinat[ing] with various companies and individuals to provide" "registration at the hospital where VORONINA gave birth," renting an apartment in Beverly Hills, and finding childcare. *Id.* ¶ 19(e). Ms. Bardakova also allegedly caused "payments to various service providers for the benefit of DERIPASKA and VORONINA in the United States" in connection with the birth. *Id.* ¶ 19(f). Roughly two years later, Ms. Bardakova allegedly assisted in making similar arrangements in California in connection with the impending birth of Ms. Voronina's second child. *Id.* ¶¶ 19(j)-19(m). On the basis of the foregoing transactions, Count One of the Indictment charges Ms. Bardakova with participating in a purported conspiracy to violate the IEEPA.

Count Three of the Indictment alleges that Ms. Bardakova made false statements to FBI agents on or about either June 2 or 3, 2022, in California. *See id.* ¶¶ 22, 29. As described in the Indictment, FBI agents stopped Ms. Bardakova "at the Los Angeles airport" and "accompanied" her "back to her hotel where they interviewed her in the lobby," where she purportedly falsely

stated (1) "that she had never communicated with DERIPASKA directly," (2) "that she did not assist VORONINA with VORONINA's trip in 2020 to give birth to her first child with DERIPASKA" and "did not send any money" from her accounts for that trip, and (3) "that she had never visited DERIPASKA's property located at 12 Gay Street" in New York.  *Id.* ¶ 22.

Consistent with the Indictment's allegation that Ms. Bardakova is a "Russian national," *id.* ¶ 4, the Indictment alleges the Ms. Bardakova was actually in the United States on just a handful of days in mid-2022, when Ms. Bardakova allegedly "travelled to the United States" on or about April 12, 2022 or thereafter, in order to "coordinate[] the arrangements for VORONINA's planned stay," *id.* ¶ 19(j), after which Ms. Bardakova "tour[ed] houses" in Los Angeles on or about May 13, 2022, *id.* ¶ 19(k), and sought to meet Ms. Voronina at the Los Angeles airport on or about June 3, 2022,[2] where she was stopped by federal agents, *id.* ¶ 22.

## **STANDARD OF REVIEW**

A defendant may move to dismiss an indictment on the grounds, *inter alia*, of "improper venue," the indictment's "lack of specificity," and the indictment's "failure to state an offense." Fed. R. Crim. P. 12(b)(3).  Although a court views the indictment as a whole and assumes its factual allegations to be true, *see Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952), this Court is empowered to dismiss the Indictment pursuant to a pretrial motion based on any defense or objection which is capable of determination without the trial of the general issue, *see United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998).

---

[2] The dates in the Indictment appear defective.  Paragraph 22 says that Ms. Bardakova's alleged statements to the FBI took place on or about June 3, 2022, *see* Indictment ¶ 22, but paragraph 29 says the statements were made a day earlier, on or about June 2, 2022, *id.* ¶ 29.

## ARGUMENT

I.    **The Court Should Dismiss Count Three Because Venue Is Improper in this District**

    A.  **Venue Is Improper in the Southern District of New York Because the Allegedly Criminal Conduct Occurred Exclusively in California During an In-Person Interview**

Venue for Count Three is not proper in the Southern District of New York, and this Court should, therefore, dismiss Count Three pursuant to Rule 12(b)(3)(A)(i) of the Federal Rules of Criminal Procedure. Both the Constitution and Rule 18 of the Federal Rules of Criminal Procedure "require that a person be tried for an offense where that offense is committed." *United States v. Cabrales*, 524 U.S. 1, 5 (1998) (internal quotation marks and citation omitted). In accordance with this well-established rule, the Second Circuit has held that "[v]enue under Section 1001 lies where the false statement was completed." *United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990).

In the present case, venue is improper in the Southern District of New York because the alleged false statements were "completed" exclusively in California. In particular, the statements alleged in Count Three were made after FBI agents met Ms. Bardakova "at the Los Angeles airport" and took her "back to her hotel where they interviewed her in the lobby." Indictment ¶ 22. Because the false statements "were uttered and received wholly inside" California, there is "no basis for venue in the Southern District of New York." *United States v. Bin Laden*, 146 F. Supp. 2d 373, 377 (S.D.N.Y. 2001) (Sand, J.) (dismissing false statements count); *see United States v. Smith*, 641 F.3d 1200, 1208-09 (10th Cir. 2011) ("In this case, the alleged crime occurred during an interview conducted in [defendant's] home in Minnesota. The false statements began, continued, and ended during the interview. . . . Under these circumstances,

6

any violation of § 1001(a)(2) occurred in Minnesota, and consequently venue lay in Minnesota, not Oklahoma.").

Other courts have reached the same conclusion on materially indistinguishable facts. In the *Bin Laden* case, for example, the evidence showed that the FBI conducted face-to-face interviews with defendant El Hage in Texas, and thereafter the government charged El Hage in the Southern District of New York with making false statements. Judge Sand observed that because "Mr. El Hage's allegedly false statements to the FBI were uttered and received wholly inside Texas," the offense charged "began, continued, and was completed in just one federal judicial district—i.e., the Northern District of Texas," and there was "no basis for venue in the Southern District of New York." *Bin Laden*, 146 F. Supp. 2d at 377.

Similarly, in *Cabrales*, 524 U.S. 1 (1998), which Judge Sand relied on in *Bin Laden*, a defendant was prosecuted in the Western District of Missouri for money laundering. The trial court dismissed the money laundering counts because the defendant had performed all the illegal transactions while inside Florida, and the government appealed. *Id.* at 4-5. The government contended that venue was proper in Missouri because the laundered money derived from drug activity there, but the Supreme Court unanimously concluded that the prosecution in Missouri was improper because "the Government indicted Cabrales for transactions which began, continued, and were completed only in Florida." *Id.* at 8 (internal quotation marks omitted).

Just as in *Bin Laden* and *Cabrales*, venue is improper in the Southern District of New York because the entirety of the offense alleged in Count Three was committed in California. Accordingly, the Court should dismiss Count Three.

### B. Venue Is Improper in the Southern District of New York Because the Case Fails the Substantial Contacts Test

Venue would not be proper in the Southern District of New York even if Ms. Bardakova's statements had some connection to the District—a connection that is nowhere apparent on the face of the Indictment—because the case fails the "substantial contacts" test. *See United States v. Miller*, 808 F.3d 607, 622 (2d Cir. 2015) (when a defendant contests venue on the grounds of hardship, prejudice, or fairness, "we supplement our venue analysis with the 'substantial contacts' inquiry, . . . . in which we examine the offense's contacts with the forum district [which] 'offers guidance on how to determine whether the location of venue is constitutional, especially in those cases where the defendant's acts did not take place within the district selected as the venue for trial'" (quoting *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000))); *United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005) ("[W]hen venue may properly lie in more than one district under a continuing offense theory, we should also ask 'whether the criminal acts in question bear "substantial contacts" with any given venue.'" (quoting *Saavedra*, 223 F.3d at 93)).

The Second Circuit applies the "substantial contacts" test when venue may lie in more than one district, and the inquiry "takes into account a number of factors": "the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding." *Miller*, 808 F.3d at 622 (quoting *United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012)).

Each of the "substantial contacts" factors weighs in favor of dismissal. The "site of the defendant's acts" is California; the "elements and nature of the crime" all relate to an interview conducted in California; the "effect" of the conduct was felt in California during the interview; and California is a more suitable venue for "accurate factfinding" (which will apparently involve

an assessment of the period of time Ms. Bardakova allegedly spent in that area).  It would be

unfair and prejudicial to force Ms. Bardakova to face trial in New York for conduct that took

place entirely elsewhere, on the opposite coast of the country.

Even beyond the fact that the government has brought Count Three in an improper venue,

Count Three is deficient in other ways as well: (1) the statements at issue are immaterial on their

face, and (2) as a Russian national whose dominant language is not English, Ms. Bardakova

could not have acted "knowingly and willfully."  *See* 18 U.S.C. § 1001.  The three alleged false

statements are that Ms. Bardakova "never communicated" with Mr. Deripaska "directly," had

"not assisted" Ms. Voronina with the birth of her first child or sent any money from her accounts

for costs associated with the birth, and had "never visited" any of Mr. Deripaska's properties in

the United States.  Indictment ¶ 29.  Nowhere does the Indictment allege that federal agents

obtained an interpreter or confirmed that Ms. Bardakova spoke English.  Thus, how Ms.

Bardakova could possibly be said to have acted "knowingly and willfully" is unclear under the

Indictment's allegations.  The statements themselves also are facially immaterial, insofar as they

do not relate to a matter within the jurisdiction of the executive branch of the United States

government.

Particularly given these deficiencies and the prejudice and unfairness inherent in trying

Ms. Bardakova in New York for conduct that took place elsewhere, the Court should dismiss

Count Three for improper venue.

## II.    The Court Should Dismiss Count One Because It Violates Due Process

The Court should dismiss Count One because even accepting the allegations in the

Indictment as true, the vast majority of Ms. Bardakova's alleged conduct relates to making

arrangements for a non-sanctioned person to give birth in the United States, and criminalizing

this innocent activity violates the due process requirement of fair notice. To the extent the Indictment alleges that Ms. Bardakova engaged in additional conduct, beyond helping Ms. Voronina, that limited additional alleged conduct (such as playing a role in flower and t-shirt transactions), which all allegedly took place overseas, does not salvage the Indictment because due process also protects against the extraterritorial application of the law to such circumstances.

The Due Process Clause of the Fifth Amendment ensures that no one shall be "deprived of life, liberty, or property, without due process of law." This protection applies to all criminal defendants, regardless of whether they are U.S. citizens or foreigners. *See United States v. Al-Moayad*, 545 F.3d 139, 178-79 (2d Cir. 2008) (vacating the convictions of two foreign defendants because, *inter alia*, they were "denied . . . due process of law and fundamental fairness"). Ms. Bardakova is thus entitled to the safeguards of due process, including the right to fair notice, which requires that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)). "[A] conviction is invalid under the Due Process Clause 'if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited . . . [.]'" *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

In the present case, a person of ordinary intelligence would not reasonably understand Ms. Bardakova's alleged conduct to be prohibited under the cited regulations. The Indictment alleges that Ms. Bardakova "combine[d], conspire[d], confederate[d], and agree[d]" to violate the IEEPA, in violation of the Ukraine-Related Executive Orders and 31 C.F.R. § 589.201, which prohibit the "making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked . . . [.]"

10

Indictment ¶¶ 8, 24.  The plain reading of these regulations is that providing "funds, goods, or services" is only prohibited when a defendant provides them to or for the benefit of a sanctioned individual.  The language clearly limits the prohibition to conduct directed towards "person[s] whose property and interests in property are blocked pursuant to" one of the identified executive orders.  Nothing in 31 C.F.R. § 589.201 and the Ukraine-Related Executive Orders hints, let alone makes clear to a person of ordinary intelligence, that providing "funds, goods, or services" to a person who is not sanctioned is a criminal offense.

Yet, the vast majority of the allegations against Ms. Bardakova are about how she made arrangements for the benefit of Ms. Voronina, who is not and has never been subject to sanctions, and her unborn (and unsanctioned) children.[3]  The government bases the IEEPA conspiracy charge on claims that Ms. Bardakova helped find obstetric care, childcare, and housing for Ms. Voronina and her babies.  No reasonable person would understand that actions taken for the benefit of a woman and her unborn child—who are not subject to any U.S. sanctions, and who cannot plausibly be said to be Mr. Deripaska's "property," as the government's faulty Indictment seems to imply—were prohibited under the Ukraine-Related Executive Orders or 31 C.F.R. § 589.201.  Contrary to its usage in the Indictment, these regulations prohibit "the making of any contribution or provision of funds, goods, or services by,

---

[3] Although the Indictment alleges that the birth arrangements were "for the benefit of DERIPASKA and VORONINA," *see* Indictment ¶¶ 19(e), (j), in sum and substance, Ms. Voronina and her unborn child or children (the Indictment does not specify whether and where the second child was born) were the only people for whom these arrangements were made and to whom the benefits were directed.  Although the Indictment alleges that Mr. Deripaska received reports about the services Ms. Voronina received for the first birth, *see id.* ¶ 19(g), that does not amount to "direct[ing]," *id.* ¶ 19(e), or "organiz[ing]," *id.* ¶19(d), these arrangements.  At best, the Indictment vaguely asserts that Mr. Deripaska provided funding, *see id.* ¶¶ 19(d), (f), (i), but even these allegations lack any concrete details regarding his involvement with the payments.  In any event, such reports would fall within the exemption in IEEPA on the President's ability to regulate personal communications.  *See* 50 U.S.C. § 1702(b)(1); 31 C.F.R. § 589.214.

to, or for the benefit of any person whose property and interests in property are blocked," and that plain language does not extend to transactions for the benefit of an unsanctioned woman and her unsanctioned unborn.  Ukraine-Related Executive Orders; 31 C.F.R. § 589.201.

The government's pursuit of Ms. Bardakova is unprecedented and contrived, in that no case or published guidance states that making arrangements for an unsanctioned woman to give birth can amount to a criminal violation of the Ukraine-Related Executive Orders or 31 C.F.R. § 589.201.  Due process "bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997).  Here, where neither the plain language of the relevant regulations nor any prior judicial or executive guidance indicated that Ms. Bardakova was prohibited from providing services to Ms. Voronina and her babies, Count One cannot stand.

Once the alleged conduct relating to Ms. Voronina's pregnancies is excluded, the Indictment contains only a handful of allegations against Ms. Bardakova in Count One, all of which appear to involve Ms. Bardakova acting outside of the United States, as the conduct does not take place during the handful of days when the Indictment alleges Ms. Bardakova was in the United States in 2022.  In particular, the Indictment alleges that Ms. Bardakova asked Ms. Shriki to arrange for a few flower and gift deliveries and to buy some t-shirts and iPhones.  *See* Indictment ¶¶ 19(b)-(c).

Due process does not allow for such spare, attenuated claims to sustain the extraterritorial reach of United States criminal law.  "[I]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally

unfair." *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003) (quoting *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir.1990)); *see also United Stated v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) ("For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is the cause harm inside the United States or to U.S. citizens or interests"). Here, there is no such nexus between Ms. Bardakova's alleged conduct and the United States.

Cases in which the Second Circuit has found a sufficient nexus are dramatically different from this one. *See, e.g., United States v. Abdalla*, 839 F. App'x 656, 657 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 278 (2021) (defendant manufactured heroin and methamphetamine intended to be distributed in the United States); *United States v. Kalichenko*, 840 F. App'x 644, 645 (2d Cir. 2021) (defendant sold sexually explicit videos of her minor daughter directly to and received compensation from the United States). Playing some limited role, while overseas, in a handful of alleged gift and flower deliveries and t-shirt and iPhone purchases cannot possibly provide a sufficient (or any) nexus to the United States sufficient to sustain a criminal charge.

On the whole, the Court should dismiss Count One of the Indictment because the vast majority of the allegations seek to criminalize innocent conduct, and the limited remaining allegations improperly apply U.S. criminal law extraterritorially, all in violation of due process.

### III.    The Court Should Dismiss Count One Because the Vast Majority of the Alleged Conduct Is Exempted from the IEEPA, and the De Minimis Remaining Conduct Cannot Support the Charge

The Court also should dismiss Count One because it fails to state an offense. The exemptions in the IEEPA itself cover the vast majority of Ms. Bardakova's alleged conduct, and the handful of allegations that are not exempted occurred overseas and do not provide an adequate basis for the extraterritorial application of U.S. law. The executive branch's power

under the IEEPA is far from limitless.  To the contrary, in 50 U.S.C. § 1702(b), Congress

enumerated four categories of activities that the president cannot "regulate or prohibit, directly or

indirectly" under the IEEPA.  Of particular relevance, 50 U.S.C. § 1702(b)(4) provides that the

President cannot regulate or prohibit, directly or indirectly:

> any transactions ordinarily *incident to travel to or from any country*, including
> importation of accompanied baggage for personal use, *maintenance within any country
> including payment of living expenses and acquisition of goods or services for personal
> use*, and arrangement or facilitation of such travel including nonscheduled air, sea, or
> land voyages.

(Emphasis added).

The vast majority of Ms. Bardakova's alleged activities are exempted by the plain text of

Section 1702(b)(4), as they involve making arrangements for Ms. Voronina's travel and

maintenance.  For example, the Indictment alleges that Ms. Bardakova helped with transactions

relating to Ms. Voronina's flights to the United States for her two births.  *See* Indictment

¶¶ 19(e), (j), and (m).  Transactions for arranging travel, however, necessarily qualify as

"transactions ordinarily incident to travel to or from any country."  For another example, the

Indictment alleges that Ms. Bardakova made housing and medical arrangements for Ms.

Voronina.  *See id.* ¶¶ 19(e), (k), and (l).  These alleged acts, however, are covered by the

exemption for the "payment of living expenses and acquisition of goods or services for personal

use."  An IEEPA conspiracy charge cannot survive a motion to dismiss when it is based on

alleged conduct that is patently exempted from the IEEPA regime.

Further, unlike other exemptions that can be suspended by the President under certain

conditions, *see* 50 U.S.C. § 1702(b)(2), Congress does not permit the President to waive the

application of Section 1702(b)(4) and intends for it to apply in full force.  The prosecution here

cannot ignore Section 1702(b)(4) and its application to the vast majority of Ms. Bardakova's alleged conduct.[4]

Courts have made clear that the Section 1702(b) exceptions are not limited in their protective effect to those who are directly sanctioned, but rather reach anyone whose conduct "directly or indirectly" is proscribed per sanctions issued pursuant to the IEEPA.  For example, in *Marland v. Trump*, 498 F. Supp. 3d 624 (E.D. Pa. 2020), a group of TikTok users challenged a regulation on TikTok usage that was implemented pursuant to a China-related executive order. Although these plaintiffs were not sanctioned entities or individuals, the court recognized that the regulation would "have the effect of preventing these users from exchanging informational materials" and, thus, run contrary to one of the applicable Section 1702(b) exceptions.  *Id.* at 639-41.  The applicability of Section 1702(b)'s exemptions did not depend on whether the parties seeking its protection were sanctioned or not.  *Id.* at 636-41; *see also TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 108 (D.D.C. 2020) ("As every communication on TikTok is itself some combination of text, images, video, and audio, Plaintiffs have shown that they are likely to

---

[4] Section 1702(b)(4) is not specifically incorporated into the Ukraine-Related Executive Orders or 31 C.F.R. § 589.201, but a court in this district recently has noted that the absence of an IEEPA exemption from a specific OFAC regulation should not be read to mean that OFAC intended to regulate that IEEPA-exempted conduct.  In particular, in *Open Society Justice Initiative v. Trump*, an IEEPA exemption for "informational materials" was not in the challenged OFAC regulation, but the district court nevertheless noted that "[a]ny attempt by OFAC to impose IEEPA penalties for conduct covered by the 'informational materials' exception plainly would be ultra vires."  510 F. Supp. 3d 198, 215 (S.D.N.Y. 2021).  In fact, in *Open Society*, the government itself argued that the absence of an IEEPA exemption from a regulation does not suggest that the exemption is not applicable, as the government explained in a filing that "any 'implication' of this omission [of the exemption from the regulation] cannot override IEEPA's clear language."  *Open Society*, 20 Civ. 8121 (KPF) (Docket Entry 51 at 23 (Government Brief in Opposition to Motion for Preliminary Injunction)).

prove the prohibitions indirectly regulate personal communications [as exempted by § 1702(b)(1)]").

Although a handful of the allegations against Ms. Bardakova are not related to helping with travel and living arrangements for Ms. Voronina, they cannot save the Indictment because due process protects against the extraterritorial application of the law to such attenuated and de minimis conduct. Once the Section 1702(b)(4) exempted conduct is struck, all that remains are allegations that involve Ms. Bardakova acting from overseas, such as allegedly calling Ms. Shriki to arrange flower deliveries or buy t-shirts. *See* Indictment ¶¶ 19(b)-(c). As already discussed, due process prohibits the application of the U.S. law to extraterritorial conduct unless there is a "sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *Yousef*, 327 F.3d 56 at 111 (quoting *Davis*, 905 F.2d at 248-49). A handful of alleged phone calls about gift deliveries and shirt purchases cannot establish the requisite nexus, and basing an IEEPA charge solely on them would violate due process. Because Section 1702(b)(4) safeguards Ms. Bardakova and the vast majority of her conduct as alleged in the Indictment and the few claims not covered by Section 1702(b)(4) occurred extraterritorially and cannot support an IEEPA charge, Ms. Bardakova cannot be subject to criminal liability, and Count One should be dismissed for failing to state an offense.

## IV.    The Court Should Address this Motion On the Merits Notwithstanding Ms. Bardakova's Absence from the District

The fact that Ms. Bardakova is not present in this District does not prevent this Court from reaching the merits of this motion. Courts in this District have recognized that because "one of the principal purposes of requiring the defendant's presence is to protect the defendant[,]" when the defendant is the one seeking to proceed in absentia, "there is greater reason to proceed to the merits[.]" *United States v. Shapiro*, 391 F. Supp. 689, 692 (S.D.N.Y.

1975).  For this and the reasons that follow, the so-called fugitive disentitlement doctrine thus has no application here.

"Disentitlement is a sanction 'most severe.'"  *United States v. Bescond*, 24 F.4th 759, 767 (2d Cir. 2021) (internal quotation marks and citation omitted).  Disentitlement is particularly "harsh when the due process right at stake is to defend liberty," as is the case here for Ms. Bardakova.  *Id.* at 768.  Accordingly, the Second Circuit is judicious in disentitling defendants and follows a two-step process to determine whether disentitlement is appropriate.  First, the court must determine whether the defendant is a fugitive, either in the "traditional" or "constructive-flight" sense.  *Id.* at 772.  Second, the court must determine whether disentitling the defendant would serve the purposes of the doctrine.  *See id.* at 770.  "If both criteria are met, the Court, in its discretion, may disentitle the fugitive."  *United States v. Cornelson*, 595 F. Supp. 3d 265, 270 (S.D.N.Y. 2022).  In the present case, neither prong of the test is met.

First, Ms. Bardakova is not a fugitive in either the "traditional" or "constructive-flight" sense.  "A traditional fugitive is '[a] person who, having committed a crime, flees from [the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of abode and conceals himself within the district.'"  *Bescond*, 24 F.4th at 771 (quoting *Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 281 (2d Cir. 1997) (alterations in original)).  Ms. Bardakova does not fit this definition.  She did not "flee" the District in which she was charged (notwithstanding the fact, set out above, that this District is an improper venue); in fact, the Indictment does not directly allege she was ever present in this District (aside from alleging she made a false statement about visiting a property here at some unspecified point in the past).  Nor did Ms. Bardakova try to "conceal" herself when federal agents confronted her in Los Angeles or otherwise avoid them.

Ms. Bardakova, who has been living continuously in her home country, also is not a constructive-flight fugitive.  A constructive-flight fugitive is "a person 'who allegedly committed crimes while in the United States but who w[as] outside the country—for whatever reason—when [she] learned that [her] arrest[] w[as] sought and who then refused to return to the United States in order to avoid prosecution." *Id.* at 772 (quoting *Collazos v. United States*, 368 F.3d 190, 199 (2d Cir. 2004) (alterations in original)).  The vast majority of the allegations against Ms. Bardakova involve actions she supposedly took while in her home country.  To the extent the Indictment alleges she engaged in limited conduct within the United States at all (while visiting California), this conduct does not suffice to make her a constructive-flight fugitive.

In *Bescond*, the Second Circuit made clear that fugitive status should not be imposed on defendants who simply continue to live in their homes and do not attempt to hide themselves from U.S. authorities.  "[I]f the doctrine were to be expanded to reach someone . . . who stays at home abroad, without concealment or evasion, Congress, not the courts, should weigh the competing issues and values and determine whether such an expansion is warranted." *Id.* at 773.  The Second Circuit's determination that Ms. Bescond, a French citizen, was not a constructive-flight fugitive centered on the court's distinction between simply remaining abroad in the country where one lived and had an established life, and actively avoiding the United States.  The Second Circuit's analysis thus turned on whether Ms. Bescond's conduct reflected efforts to evade or circumvent U.S. jurisdiction.  Similarly, the district court in *Cornelson* recently rejected the government's claim that Mr. Cornelson, a Brazilian citizen, was refusing to return to the United States and thus a constructive-flight fugitive.  595 F. Supp. 3d at 271.  Instead, considering that Mr. Cornelson had been living in Brazil for years before the indictment, the court determined that he had "simply remain[ed] at home." *Id.* (quoting *Bescond*, 24 F.4th at

772).  The court reached this conclusion despite evidence suggesting that Mr. Cornelson owned a home in the United States and that prior to being questioned by the government, he had visited the United States at least once a year.  *Id.*

Like the defendants in *Bescond* and *Cornelson*, nothing here suggests that Ms. Bardakova has avoided or refused to travel to the United States.  Rather, she "simply remains at home" in Russia, the country where she has resided her entire life.[5]  No evidence of a nefarious intent to evade U.S. authority exists or is alleged.  Ms. Bardakova simply has a life filled with significant responsibilities that keep her home in Russia; she has no bank accounts, real estate, or relatives in the United States, nor any other reason to be in the country.  Because Ms. Bardakova "is not a fugitive under either definition of the term . . . the fugitive disentitlement doctrine is inapplicable."  *Id.* at 272.

Regardless of whether Ms. Bardakova qualifies as a fugitive, disentitling her also is not appropriate because disentitlement would not serve any of the four purposes identified by the Second Circuit: (1) "assuring the enforceability of any decision that may be rendered against the fugitive;" (2) "imposing a penalty for flouting the judicial process;" (3) "discouraging flights from justice and promoting the efficient operation of the courts;" and (4) "avoiding prejudice to the other side caused by the defendant's escape."  *See Bescond*, 24 F. 4th at 773-74.

With respect to the first purpose, the goal is to ensure mutuality in litigation, *id.* at 774, namely, preventing a defendant from enjoying a decision dismissing an indictment without being "willing to bear the consequences of a decision upholding it," *Cornelson*, 595 F. Supp. 3d at 272 (quoting *In re Hijazi*, 589 F.3d 401, 413 (7th Cir. 2009)).  "The paradigmatic case in which

---

[5] The fact that Ms. Bardakova is a citizen and resident of Russia does not appear to be in dispute. To the extent the government disputes that Ms. Bardakova is in Russia, an affidavit from Ms. Bardakova attesting to her residence in Russia could be provided.

mutuality is absent is where the defendant flees to 'seize an unfair advantage' or to 'game the system.'" *Id.* (quoting *Bescond*, 24 F.4th at 774). In *Bescond*, the Second Circuit determined that disentitlement was "too harsh a means of ensuring mutuality" because Ms. Bescond had not "fled the district court's jurisdiction," nor "did so to seize an unfair advantage or game the system." 24 F.4th at 774. The same is true of Ms. Bardakova. Further, just as the court observed of Mr. Cornelson, Ms. Bardakova faces "significant adverse consequences if [s]he loses on h[er] motion to dismiss," including making it "very risky" to leave her home country. *Cornelson*, 595 F. Supp. 3d at 272 (internal quotation marks and citation omitted). Such risks are sufficient to ensure mutuality without disentitlement. *Id.*; *see also Hijazi*, 589 F.3d at 413-14.

With respect to the second purpose, courts consider whether a defendant has "exhibit[ed] disrespect for U.S. law," which largely turns on whether the defendant's "reasons for litigating from home are legitimate and fair." *Bescond*, 24 F. 4th at 774. Ms. Bardakova is a Russian citizen, and the hardship of requiring a defendant such as Ms. Bardakova to travel to the United States just to have the opportunity to clear her name necessarily poses financial and familial challenges. In these circumstances, Ms. Bardakova's reasons for litigating from home are eminently "legitimate and fair."

With respect to the third purpose, the analysis turns on whether adjudicating the defendant's motion on the merits "would eradicate any incentive for [others] to comply with an arrest warrant, submit to a court's jurisdiction, and respond to the Government's allegations." *Id.* (quoting *United States v. Sindzingre*, No. 17-cr-0464, 2019 WL 2290494, at *7 (E.D.N.Y. May 29, 2019) (alteration in original)). Whether or not the defendant's situation is widely applicable

20

to other defendants, both in terms of personal attributes and alleged criminal conduct, factors into this determination.

In *Bescond* and *Cornelson*, the courts focused on, *inter alia*, the fact that the charged offenses "affected the United States—allegedly—only through a chain of other actors in other countries"; the defendants "did not act for a criminal organization"; and their respective "home countr[ies] protect[] them from extradition." *Id.; Cornelson*, 595 F. Supp. 3d at 273. Ms. Bardakova shares these same qualities, and therefore, as with Ms. Bescond and Mr. Cornelson, "there exists no cohort of fugitives who would perceive an adjudication of [Ms. Bardakova's] motion[] as inducement or inspiration to flee the jurisdiction of our court." *Bescond*, 24 F. 4th at 774. Further, even if disentitling Ms. Bardakova could have a slight deterrer effect, the Second Circuit has warned that such an effect alone is not sufficient for disentitlement. "Some deterrent effect exists, of course, in all cases, but . . . we question whether a slight general deterrence effect can outweigh the countervailing harm to the judicial process, which seeks to resolve cases on the merits whenever possible." *Nen Di Wu v. Holder*, 646 F.3d 133, 137 (2d Cir. 2011).

Finally, with respect to the fourth purpose, no risk exists of "prejudice to the other side caused by the defendant's escape." Ms. Bardakova did not "escape." She simply has remained in her home country. The government would not be prejudiced by Ms. Bardakova's absence. In fact, the clear evidence is to the contrary, as the government has arraigned Ms. Shriki, her co-defendant, and that case is proceeding apace. Further, courts should consider the "countervailing prejudice" posed by disentitlement. *Bescond,* 24 F.4th at 775. For Ms. Bardakova, the prejudice is enormous. Disentitling her would force her to travel to the United States in order to assert the arguments set out above. Such travel and lodging are prohibitively expensive, and she would almost certainly be arrested on arrival (if not before). Far from the government suffering

prejudice, "[d]isentitlement enables the government to coerce [Ms. Bardakova's] presence in court by imposing financial, reputational, and family hardship regardless of her guilt or innocence[.]" *Id.*

Finally, the fact that Ms. Bardakova is challenging her Indictment on due process grounds underscores why she must be permitted an opportunity to be heard by this Court. The Fifth Amendment's due process protections are so fundamental that they apply to foreign defendants in ways that other amendments may not. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 278 (1990) (Kennedy, J., concurring) (noting that when "[t]he United States is prosecuting a foreign national in a court established under Article III, . . . [a]ll would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant"). Additionally, courts have recognized that foreign defendants' due process challenges to indictments should be afforded judicial review even when the defendants are not on U.S. soil. *See, e.g., United States v. Noriega*, 683 F. Supp. 1373, 1375 (S.D. Fla. 1988) (allowing a foreign defendant to challenge his indictment without traveling to the United States because "considering basic notions of due process, the court is moved to hear arguments, at the outset of the case, discussing the validity of the indictment"). These broader due process considerations reinforce why this Court should address Ms. Bardakova's motion on the merits.

In sum, disentitling Ms. Bardakova would not serve any of the doctrine's four purposes, and this Court should proceed with adjudicating her motion to dismiss on the merits.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Indictment with respect to Ms. Bardakova.


Dated:  New York, New York                            Respectfully Submitted,
        November 3, 2023


                                                      MORVILLO ABRAMOWITZ GRAND
                                                      IASON & ANELLO P.C.

                                         By:    /s/ Robert J. Anello
                                                Robert J. Anello
                                                Brian A. Jacobs
                                                Courtney D. Morphet
                                                565 5th Avenue
                                                New York, NY 10017
                                                Tel: (212) 856-9600

                                                *Attorneys for Defendant Natalia Bardakova*