UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                              :
UNITED STATES OF AMERICA         :
                                              :
         - v. -                               :
                                              :
OLEG VLADIMIROVICH DERIPASKA,    :                22 Cr. 518 (PKC)
et al.,                                       :
         Defendants.                 :
                                              :
------------------------------------------------------x


**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT NATALIA BARDAKOVA'S MOTION TO DISMISS THE INDICTMENT**


DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York


Vladislav Vainberg
Assistant United States Attorney
- Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................... 4

   I.     Procedural History ................................................................................. 4

   II.    Background ............................................................................................ 4

       A.     The Ukraine-Related Sanctions on Deripaska ................................ 4

       B.     Bardakova Helps Deripaska Violate Sanctions by Employing a U.S. Citizen to Conduct Unlawful Transactions in the United States ............................................. 6

       C.     The Scheme Unravels and Bardakova Lies to FBI While Committing Sanctions Violations in the United States ................................... 8

       D.     Bardakova's Other Ties to the United States ................................... 9

       E.     The FBI Arrests Bardakova's Co-Conspirator and Bardakova Remains a Fugitive after Learning of the Charges ............................... 11

DISCUSSION ..................................................................................................... 11

   III.    Bardakova Is Disentitled from Challenging the Indictment ....................... 11

       A.     Applicable Law ........................................................................... 12

       B.     Argument ................................................................................... 16

          1.    Bardakova Is a Fugitive under Second Circuit Law ........................ 16

          2.    Disentitling Bardakova Serves the Objectives of the Fugitive Disentitlement Doctrine ............................................................... 19

   IV.    Bardakova's Motion Would Fail On the Merits ...................................... 23

       A.     Venue is Proper in the Southern District of New York ...................... 23

          1.    Applicable Law – Motions to Dismiss on Venue Grounds .............. 23

          2.    Applicable Law – False Statements ............................................. 25

          3.    Discussion .............................................................................. 26

       B.     Count One Does Not Violate Due Process or IEEPA ......................... 28

          1.    Applicable Law ........................................................................ 29

          2.    Discussion .............................................................................. 29

CONCLUSION ................................................................................................... 36

## TABLE OF AUTHORITIES

**Cases**

*Antonio-Martinez v. I.N.S.*, 317 F.3d 1089 (9th Cir. 2003) ............................................ 19

*Collazos v. United States*, 368 F.3d 190 (2d Cir. 2004) ................................................ 20

*Degen v. United States*, 517 U.S. 820 (1996) ................................................... 12, 13, 14

*Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278 (2d Cir. 1997) ................. 12, 14

*Epsilon Electronics, Inc. v. Dep't of Treasury*, 857 F.3d 913 (D.C. Cir. 2017) ......................... 35

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95 (1941) ................................ 34

*Gao v. Gonzales*, 481 F.3d 173 (2d Cir. 2007) ....................................................... 14, 19

*Hamling v. United States*, 418 U.S. 87 (1974)); ......................................................... 24

*Hanson v. Phillips*, 442 F.3d 789, 795 (2d Cir. 2006) ................................................... 13

*In re Grand Jury Subpoenas dated March 9, 2001*, 179 F. Supp. 2d 270 (S.D.N.Y. 2001) ........ 12

*Lewis v. United States*, 146 U.S. 370, 372 (1892) ....................................................... 12

*Molinaro v. New Jersey*, 396 U.S. 365 (1970) ............................................................ 12

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) ........................................... 14

*Nen Di Wu v. Holder*, 646 F.3d 133 (2d Cir. 2011) ..................................................... 12

*SEC v. Berger*, 322 F.3d 187 (2d Cir. 2003) ......................................................... 14, 20

*Springfield Hospital, Inc. v. Guzman*, 28 F.4th 403 (2d Cir. 2022) ...................................... 33

*United States v. $45,940 in United States Currency*, 739 F.2d 792 (2d Cir. 1984), *abrogated on other grounds by Degen* ................................................................................. 14

*United States v. Adekanbi*, 675 F.3d 178 (2d Cir.2012) ................................................. 26

*United States v. Bankman-Fried*, 2023 WL 4194773 (S.D.N.Y. June 27, 2023) ......................... 24

*United States v. Bescond*, 7 F.4th 127 (2d Cir. 2021) ............................................... passim

*United States v. Blanco*, 861 F.2d 773 (2d Cir. 1988) ................................................... 14

*United States v. Broward*, 594 F.2d 345 (2d Cir. 1979) ................................................. 29

*United States v. Canady*, 126 F.3d 352 (2d Cir. 1997) ................................................. 12

*United States v. Candella*, 487 F.2d 1223 (2d Cir. 1973) ............................................ 25, 28

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) ........................................ 25, 26, 27, 28

*United States v. Eng*, 951 F.2d 461 (2d Cir. 1991) ................................................. 12, 13

*United States v. Fox*, 10 Cr. 318 (DLC), 2020 WL 4177796 (S.D.N.Y. Jan. 27, 2020) ............. 22

*United States v. Hayes,* 118 F. Supp. 3d 620 (S.D.N.Y. 2015) ....................................... 8, 13, 22

*United States v. Herrera,* 584 F.2d 1137 (2d Cir. 1978) ................................................ 34

*United States v. Korolkov*, 870 F. Supp. 60 (S.D.N.Y. 1994) ....................................... 24

*United States v. Lopez Bello*, No. 19 CR. 144 (AKH), 2023 WL 3199968 (S.D.N.Y. May 2, 2023) ............................................................................................................... 8, 22

*United States v. Morton*, 467 U.S. 822 (1984).............................................................. 33

*United States v. Milton*, No. 21 CR. 478 (ER), 2021 WL 5304328 (S.D.N.Y. Nov. 15, 2021 .... 26

*United States v. Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010) ................................. 24, 27

*United States v. Peterson*, 357 F. Supp. 2d 748 (S.D.N.Y. 2005) ................................. 24

*United States v. Pham*, 2022 WL 993119 (S.D.N.Y. Apr. 1, 2022) ............................... 23

*United States v. Phillips*, No. 22-CR-138 (LJL), 2023 WL 5671227 (S.D.N.Y. Sept. 1, 2023). 13, 24

*United States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005) ............................................ 25, 28

*United States v. Ringer*, 300 F.3d 788 (7th Cir. 2002) .................................................. 28

*United States v. Rommy*, 506 F.3d 108 (2d Cir. 2007). ................................................. 24

*United States v. Salinas*, 373 F.3d 161 (4th Cir. 2004) ............................................ 25, 27

*United States v. Silver*, 117 F. Supp. 3d 461 (S.D.N.Y. 2015) ..................................... 23

*United States v. Stein*, 429 F. Supp. 2d 633 (S.D.N.Y. 2006) ...................................... 24

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ................................................. 23

*United States v. Szur*, No. S5 97 Cr. 108 (JGK), 1998 WL 132942 ............................... 24

*United States v. Zedner*, 555 F.3d 68 (2d Cir. 2008) ............................................... 14, 19

**Statutes and Regulations**

18 U.S.C. § 1001(a) ....................................................................................................... 24

18 U.S.C. § 3237(a) ....................................................................................................... 25

50 U.S.C. § 1702(b)(4) ................................................................................................... 31

Title 50, United States Code, Sections 1705.......................................................... passim

Executive Order 13660 ............................................................................................... 5, 30

Executive Order 13661 ..................................................................................................... 5

Executive Order 13662 ................................................................................................. 5, 6

Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103–236, 108 Stat. 474 (1994)........................................................................................................ 31

H.R. Conf. Rep. 103-482, *as reprinted in* 1994 U.S.C.C.A.N. 398, 482. ..................... 32

House Conf. Rep. 103-482, *as reprinted in* 1994 U.S.C.C.A.N. 398, 483 .................................. 32

**Other Authorities**

Merriam-Webster, www.merriam-webster.com/dictionary (last accessed Dec. 22, 2023) .......... 34

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 15, at 132 (2012) ...................................................................................................................... 35

*Sword or Shield: Due Process & the Fugitive Disentitlement Doctrine*, 87 J. Crim. L. & Criminology 751 (1997) ............................................................................................ 12

**Rules**

Federal Rule of Criminal Procedure 7(c)(1) ......................................................... 23, 28

**PRELIMINARY STATEMENT**

Natalia Bardakova is a Russian national and a long-time assistant of sanctioned Russian oligarch Oleg Deripaska.  From April 2018, when the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Deripaska as a Specially Designated National ("SDN") until September 2022, when Deripaska, Bardakova, and others were charged in this Indictment, Bardakova engaged in a four-year conspiracy to help Deripaska violate sanctions by employing U.S. citizen Olga Shriki to engage in millions of dollars of unlawful financial transactions in the United States.

As discussed further below, Deripaska used Bardakova's and Shriki's assistance post-sanctions to: (1) sell his three-million dollar music studio in California in 2019, (2) coordinate and pay hundreds of thousands of dollars of expenses related to a successful plan to have Deripaska's child obtain U.S. citizenship by birth in the United States in 2020, and an attempt to do the same with a second child in 2022, and (3) periodically buy products in the United States for Deripaska, as well as send gifts from Deripaska to others in the United States.  Indictment ("Ind.") ¶ 19.  All of this conduct violated the International Emergency Economic Powers Act ("IEEPA"), and Bardakova was central to this scheme.  She coordinated hundreds of thousands of dollars of U.S. dollar payments to Shriki on behalf of Deripaska, passed instructions to Shriki, reported to Deripaska, and ultimately travelled to the United States in 2022 to find and pay for luxury housing and other services for the anticipated birth of Deripaska's second child with co-defendant Ekaterina Voronina.  The scheme unraveled when the FBI identified and approached Bardakova on June 2, 2022, while she was in Los Angeles International Airport waiting for Voronina to arrive. The FBI served Bardakova with a grand jury subpoena issued from the Southern District of New York and interviewed Bardakova.  As alleged in the Indictment, Bardakova then repeatedly and

1

materially lied about her work for Deripaska (as Charged in Count Three).  She turned over cell phones that were subsequently searched pursuant to a search warrant and found to contain further evidence of Bardakova's participation in this scheme.  Bardakova left the United States for Russia only three days after lying to the FBI and before she could be charged and apprehended.  For her part, Voronina lied to officers of the U.S. Department of Homeland Security about who was funding her housing (as charged in Count Four), and was not admitted into the United States.

Bardakova now seeks to hide behind her status as a non-U.S. citizen to challenge the Indictment while not submitting herself to this Court's jurisdiction.  But by refusing to answer for her criminal conduct and return to the United States—where Bardakova previously travelled more than ten times, bore her own U.S. citizen child during an extended three-month stay, and fled after being confronted by law enforcement during an ongoing scheme—Bardakova is a fugitive from the law.

The fugitive disentitlement doctrine—an equitable doctrine stemming from the judicial authority to protect the integrity of proceedings and judgments—exists for just such a case.  The doctrine squarely applies here, and as a result the Court need not—and should not—entertain Bardakova's challenges to the Indictment while she actively hides away in the safe confines of a country, Russia, that will never extradite her or Deripaska.  Simply put, in seeking to have her day in court without submitting herself to the Court's jurisdiction, Bardakova has no entitlement to call upon the Court to adjudicate her arguments.

The Second Circuit's recent decision in *United States v. Bescond*, 24 F.4th 759 (2d Cir. 2021), which the defendant relies on heavily in her opening brief, is a far cry from this case.  Whereas *Bescond* involved a defendant that was "never here" in the United States and had virtually no connection to the United States, 24 F.4th at 771, 774, Bardakova, by contrast, was caught by

FBI agents in the midst of carrying out the scheme in United States, then committed an additional crime here by lying to the FBI, and left the United States for Russia only three days later as the scheme unfolded and she learned she was under grand jury investigation. Bardakova is a fugitive actively evading the Court's jurisdiction.

Furthermore, all of the factors courts are instructed to consider when applying the fugitive disentitlement doctrine militate in favor of disentitlement here. A decision against Bardakova would not be enforceable by this Court when Bardakova refuses to appear for proceedings in this case and face the charges. Moreover, to consider Bardakova's motion on the merits would essentially reward her and Deripaska's blatant disrespect of the judicial process; it would also promote perverse incentives for powerful sanctioned individuals ensconced in non-extraditable countries like Russia to use their subordinates to flagrantly violate sanctions here, and then flee to safety and seek to litigate from beyond the reach of the Court. A consideration on the merits would exacerbate the prejudice to the Government already engendered by Bardakova's knowing refusal to submit to the Court's jurisdiction. Accordingly, this Court should apply the fugitive disentitlement doctrine and decline to reach the merits of Bardakova's motion.

In any event, for the reasons described below, Bardakova's motion would fail on the merits. Bardakova's challenge to venue on the false statements charge in Count Three fails under established law because the Indictment sufficiently alleges venue, and Bardakova's false statements were transmitted to and relied upon in the Southern District of New York, making venue proper here. Bardakova also challenges a subset of alleged overt acts related to the birth scheme under the due process clause and pursuant to the so-called travel exemption in IEEPA. Bardakova is wrong on the law and the facts. Because the Indictment sufficiently alleges a four-year conspiracy to unlawfully employ a U.S. citizen to perform a wide array of undisputedly

3

unlawful services under IEEPA, tracks the language of the statute, and alleges all of the essential elements of conspiracy, it is squarely sufficient and Bardakova's motion should be denied.

## BACKGROUND

### I.    Procedural History

On September 28, 2022, a grand jury sitting in this District returned a four-count superseding S1 Indictment charging, in Count One, Oleg Deripaska, Natalia Bardakova, and Olga Shriki with conspiracy to violate IEEPA, Executive Orders 13660, 13661, and 13662 (the "Ukraine-Related Executive Orders"), and implementing regulations, 31 C.F.R. Part 589.201.  The Indictment also charged Bardakova with making false statements to Special Agents from the Federal Bureau of Investigation ("FBI") related to her work for Deripaska in Count Three.  Deripaska's U.S.-citizen employee Olga Shriki and Deripaska's romantic partner, Ekaterina Voronina were also separately charged with obstruction of justice, and making false statements, respectively.  Shriki was arrested and arraigned.  Russian nationals Bardakova, Deripaska, and Voronina are abroad and at large.

### II.    Background

#### A.  The Ukraine-Related Sanctions on Deripaska

Oleg Deripaska is a Russian national, who at all relevant times to the Indictment, was the owner and controller, directly or indirectly, of Basic Element Limited ("Basic Element"), a private investment and management company for Deripaska's various business interests.  Ind. ¶ 2.

IEEPA, codified at Title 50, United States Code, Sections 1701-1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter."  50 U.S.C. § 1705(a).  In 2014, after Russia

invaded the Crimean Peninsula, the President issued Executive Order 13660 pursuant to his authorities under the IEEPA, which declared a national emergency with respect to the situation in Ukraine. Ind. ¶ 8. To address this national emergency, the President blocked all property and interest in property that were then or thereafter came within the United States or that were then or thereafter came within the possession or control of any United States person, of individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria. *Id.* Executive Order 13660 prohibits, among other things, the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked, and the receipt of any contribution or provision of funds, goods, or services from any such person. *Id.* The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine has remained in continuous effect since 2014, *id.*, and was most recently continued on March 1, 2023.

The President on multiple occasions expanded the scope of the national emergency declared in Executive Order 13660, including through: (1) Executive Order 13661, issued on March 16, 2014, which addresses the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addresses the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine. Ind. ¶ 10. Executive Orders 13660, 13661, and 13662 are collectively referred to as the "Ukraine-Related Executive Orders."

On or about April 6, 2018, OFAC designated Oleg Deripaska as an SDN pursuant to the Ukraine-Related Executive Orders. In particular, OFAC designated Deripaska pursuant to Executive Order 13661 for having acted or purported to act for or on behalf of, directly or

indirectly, a senior official of the Government of the Russian Federation, as well as pursuant to Executive Order 13662 for operating in the energy sector of the Russian Federation economy. On or about the same date, OFAC also designated Basic Element.

### B. Bardakova Helps Deripaska Violate Sanctions by Employing a U.S. Citizen to Conduct Unlawful Transactions in the United States

Among other things, the sanctions on Deripaska prohibited making any contribution or provision of funds, goods, or services by, to, or for the benefit of Deripaska, whose property and interests in property were blocked, and receiving any contribution or provision of funds, goods, or services from Deripaska. Ind. ¶ 1. Yet for over four years afterwards, and in violation of those sanctions, with the assistance of Bardakova, Deripaska continued to employ U.S. citizen Olga Shriki to provide hundreds of thousands of dollars' worth of services for his benefit in the United States. *Id.* Shriki lived in the United States and worked for Deripaska's Basic Element in its Manhattan office between in or about 2013 and 2018. Ind. ¶ 15. After the imposition of sanctions, Shriki helped wind down the Basic Element office and continued to unlawfully work for Deripaska, including as a "[t]rusted contact for any assignments by OVD," *i.e.*, Oleg Vladimirovich Deripaska. Ind. ¶ 15. Shriki created a consulting business called Global Consulting Services LLC ("Global Consulting") and coordinated directly with Bardakova to provide services for Deripaska and to continue receiving funds from Deripaska or entities under his control. Ind. ¶ 16.

With Bardakova helping to coordinate Deripaska's payments to Shriki, Bardakova and Shriki engaged in millions of dollars of unlawful transactions for Deripaska. Ind. ¶ 19. Deripaska "used Shriki's and Bardakova's assistance to engage in several endeavors in the United States in violation of the Ukraine-Related Executive Orders and Ukraine-Related Sanctions, regulations, including:" (1) selling Deripaska's music studio in California for approximately $3,078,787 in

2019, *id.* ¶ 19 and 19(a), (2) arranging and paying over $300,000 in expenses related to the birth and upkeep of Deripaska's child in the United States in 2020, including a luxury penthouse rental in Beverly Hills for half a year, private jet flights in and out of the United States, private hospital costs, childcare in the form of at least five nannies and a housekeeper, and the filing of a U.S. birth certificate, *id.* ¶ 19(e), (g), (h); (3) arranging and paying over $400,000 in new expenses related to an unsuccessful attempt to coordinate the U.S. birth of a second child of Deripaska's in 2022, Ind. ¶ 19(i), and (4) routinely buying iPhones and other products in the United States for Deripaska, and sending gifts from Deripaska to others in the United States, *id.* ¶ 1, 19(c).

Bardakova was central to the conspiracy, coordinating hundreds of thousands of dollars of payments to Shriki on behalf of Deripaska, passing instructions to Shriki at Deripaska's behest, and reporting to Deripaska. Among other things, Bardakova unlawfully coordinated over $170,000 in payments on behalf of Deripaska to Shriki's Global Consulting bank account at a U.S. financial institution. Ind. ¶ 19(f). A portion of these funds were retained by Shriki as compensation for her unlawful employment by Deripaska. Shriki used some of the remaining funds to pay for, or reimburse herself for the payment of, rent for the Beverly Hills Penthouse, medical providers, nannies, transportation, and other expenses related to Deripaska's child, for the benefit of Deripaska and Voronina. *Id.* Using funds from her personal bank account in Russia, Bardakova separately caused thousands of dollars of payments to various service providers for the benefit of Deripaska and Voronina in the United States. *Id.*

Bardakova also personally travelled to the United States in 2022 to facilitate the birth of Deripaska's second child. In or about May 13, 2022, Bardakova travelled to Los Angeles and toured houses to rent for Voronina's upcoming stay for Deripaska's benefit. Ind. ¶ 19(k)-(l). After finding a house that met Deripaska's approval, Bardakova coordinated approximately $229,000 in

payments to intermediaries in Russia in order to have a U.S.-based entity fund the cost of the Beverly Hills house rental.  *Id.*

### C.  The Scheme Unravels and Bardakova Lies to FBI While Committing Sanctions Violations in the United States

On June 2, 2022, approximately three weeks after Bardakova arrived to the United States, Bardakova went to Los Angeles International Airport to pick up Voronina after Voronina's arrival on a private jet Bardakova and Deripaska arranged.  Ind. ¶¶ 19(m), 22.  FBI agents approached Bardakova at the airport, and served her with a subpoena from a grand jury in the Southern District of New York.[1]  The subpoena required Bardakova to appear before the grand jury in Manhattan "forthwith" to testify and give evidence regarding alleged violations of, among other listed statutes, IEEPA, 50 U.S.C. §§ 1702 and 1705, and to produce any cell phones in her possession to the grand jury.  Bardakova and the agents travelled back to her hotel lobby where Bardakova was interviewed into the morning of June 3, 2022 about, among other things, her work for Deripaska.  Ind. ¶ 22.  In lieu of appearing before the grand jury, Bardakova provided two cell phones to FBI agents to transport to the grand jury in this District.

In the course of the same encounter, while admitting that she had travelled to the United States to facilitate arrangements for Voronina to give birth, Bardakova made multiple false

---

[1] Although the Government respectfully submits that the facts alleged in the Indictment are sufficient to apply the fugitive disentitlement doctrine against Bardakova, it proffers a limited set of additional facts related to Bardakova's presence and ties to the United States, not typically cited in charging instruments, because such facts are directly relevant to this Court's analysis under the fugitive disentitlement doctrine and only serve to further confirm the propriety of disentitlement here.  *See, e.g.*, *United States v. Bescond*, 24 F.4th 759 (2d Cir. 2021) (analyzing applicability of fugitive disentitlement to defendant who lived in France, was "never here" in the United States, and had virtually no connection to the United States), *United States v. Lopez Bello*, No. 19 CR. 144 (AKH), 2023 WL 3199968, at *1 (S.D.N.Y. May 2, 2023) (disentitling sanctioned defendant who had extensive U.S. ties, moved out of the United States after being sanctioned, and committed sanctions evasion from abroad); *United States v. Hayes,* 118 F. Supp. 3d 620, 627 (S.D.N.Y. 2015) (analyzing defendant's residency and disentitling defendant who committed LIBOR manipulation while living in Switzerland).

statements to the FBI agents about her work for Deripaska. For example, notwithstanding Bardakova's conversations with Deripaska cited in the Indictment (Ind. ¶ 19(g),(m)), Bardakova falsely stated that she had never communicated with Deripaska directly. Ind. ¶ 22. Bardakova also falsely stated that she did not assist Voronina with Voronina's trip in 2020 to give birth to her first child with Deripaska and, specifically, contrary to the allegations in the Indictment (Ind. ¶ 19(f)), did not send any money from Bardakova's accounts for expenses associated with that trip. Ind. ¶ 22. As alleged in the Indictment, several properties originally purchased by Deripaska in the United States, including properties located at 2501 30th Street NW, Washington D.C.; 12 Gay Street, New York, New York; and 11 East 64th Street, New York, New York were maintained on his behalf at all relevant times, including post-sanctions. Ind. ¶ 2. When questioned about these properties, Bardakova falsely stated, among other lies, that she had never visited Deripaska's property located at 12 Gay Street, New York, New York, Ind. ¶ 22, despite, among other things, photographic evidence in the Government's possession of Bardakova taking a picture standing opposite that building during her prior travels to New York in 2016.[2]

Voronina also lied to U.S. government officers, and was not admitted to the United States. On June 6, 2022, three days after Bardakova lied to the FBI and turned over cell phones that were subsequently confirmed to contain evidence of Bardakova's participation in the charged conspiracy, Bardakova departed the United States.

**D. Bardakova's Other Ties to the United States**

Bardakova's encounter with the FBI was not the first time she travelled to the United States, or even the first time she travelled to the United States while working for Deripaska.

---

[2] The Indictment alleges that Bardakova's statement was false. Ind. ¶ 22. The Government notes the photographic evidence of Bardakova's prior New York visit solely in the context of Bardakova's considerable connections to the United States and application of fugitive disentitlement.

Since 2009, Bardakova has travelled to the United States more than *ten times*.[3]  Bardakova has travelled to this country for both, business for Deripaska, and for her own pleasure.  As evident by messages, documents, and photographs of Bardakova in New York obtained from court-authorized search warrants, Bardakova met with Shriki in New York during prior travels, and Bardakova took a selfie photograph of herself standing near Deripaska's property at 12 Gay Street.  Bardakova has notable personal ties to the United States.  Most significantly, as she admitted to the FBI, she travelled to the United States and stayed for three months between September 2013 and December 2013 in order to give birth to her own son in New York.  *See* Ex. A. at 2, 5.  Her son is thus a U.S. citizen.  As evident by CBP records, in the middle of that stay in November 2013, Bardakova's older daughter also arrived to New York from Russia.  *See* Ex. A at 6.  Bardakova separately travelled to the United States on at least two other visits with her older daughter, in 2011 and 2014.  Bardakova regularly travelled to the United States prior to the COVID-19 pandemic, including in the years 2009, 2010, 2011, 2012, 2013 (as part of her own three-month birth tourism stay), 2014, 2015, 2016,[4] and 2017, including multiple visits in certain years.  *See* Ex. A at 1-3.  She returned to the United States in 2022 when she was approached by the FBI while actively helping Deripaska violate sanctions, and has never been back since being confronted and subsequently charged.

---

[3] *See* Exhibit A, U.S. Customs and Border Protection records indicating "on board" status, and arrival location and times for Natalia Bardakova, and her two children.  The Government respectfully requests exhibits A and B, comprising Bardakova and her children's travel and/or immigration records to be submitted under seal.

[4] On her visa application in 2016, Bardakova listed her employer as "Basic Element," and her duties as: "I am an advisor to the chairman."  *See* Ex. B, Certification of Visa Records of the Bureau of Consular Affairs, U.S. Department of State, dated Dec. 26, 2023.  The chairman of Basic Element was Deripaska.

### E.  The FBI Arrests Bardakova's Co-Conspirator and Bardakova Remains a Fugitive after Learning of the Charges

On September 29, 2022, the Indictment charging Deripaska, Bardakova, Shriki, and Voronina was unsealed and a press release was issued announcing Shriki's arrest.  Deripaska retained counsel who filed a notice of appearance and personally attended the initial conference in Shriki's case.  In contrast to Bardakova's past repeated travels to the United States, Bardakova has avoided the United States and U.S. authorities since leaving the United States three days after she lied to the FBI and surrendered evidence. Despite her knowledge of the pending charges, Bardakova has not surrendered to United States authorities.  She has not been arraigned, nor submitted to this Court's jurisdiction in any way.  She is a fugitive.

## DISCUSSION

## III.    Bardakova Is Disentitled from Challenging the Indictment

This Court should decline to consider Bardakova's motion at this time.  Because Bardakova is a fugitive who refuses to submit to the Court's jurisdiction, she is not entitled to advance the motion, and that conclusion is entirely consistent with, and supported by, the Second Circuit's recent decision in *Bescond*.  A decision against Bardakova would not be enforceable by this Court—when Bardakova refuses to appear for proceedings in this case and face the charges. Moreover, countenancing her motion and considering it on the merits would not only reward her deliberate flouting of the judicial process but would also promote perverse incentives to flee or evade justice and then seek to litigate from beyond the reach of the Court. Ruling in Bardakova's favor would thus exacerbate the prejudice to the Government already engendered by Bardakova's knowing refusal to submit to the Court's jurisdiction.

### A. Applicable Law

"A leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of the prisoner." *United States v. Canady*, 126 F.3d 352, 360 (2d Cir. 1997) (quoting *Lewis v. United States*, 146 U.S. 370, 372 (1892)). It is equally axiomatic that federal courts "have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities." *Degen v. United States*, 517 U.S. 820, 823 (1996). From these two core concepts—the necessity of a defendant's presence and the authority of a court to protect the integrity of its judgments—springs the concept of fugitive disentitlement.

The fugitive disentitlement doctrine is based on the longstanding principle that "'the fugitive from justice may not seek relief from the judicial system whose authority he or she evades.'" *In re Grand Jury Subpoenas dated March 9, 2001*, 179 F. Supp. 2d 270, 285-86 (S.D.N.Y. 2001) (Chin, J.) (quoting Martha B. Stolley, *Sword or Shield: Due Process & the Fugitive Disentitlement Doctrine*, 87 J. Crim. L. & Criminology 751, 752 (1997)). It is "grounded on the impropriety of permitting a fugitive to pursue a claim in federal court where he might accrue a benefit, while at the same time avoiding an action of the same court that might sanction him." *United States v. Eng*, 951 F.2d 461, 465 (2d Cir. 1991), *abrogated on other grounds by Degen*. A court may therefore "decline to entertain the claims of a defendant who is a fugitive from justice." *Bescond*, 24 F.4th at 764 (citing *Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970); *Nen Di Wu v. Holder*, 646 F.3d 133, 135 & n.2 (2d Cir. 2011)); *see also Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 280 (2d Cir. 1997) ("This Court—as well as other Courts of Appeals—

has adopted the fugitive from justice rule, also known as the fugitive disentitlement doctrine";
collecting cases).

The doctrine, which stems from courts' "inherent authority to protect their proceedings and
judgments in the course of discharging their traditional responsibilities," *Degen*, 517 U.S. at 823,
is an equitable one that may be invoked at the court's discretion. *See Hanson v. Phillips*, 442 F.3d
789, 795 (2d Cir. 2006).  Before determining whether to exercise its discretion to apply the
doctrine, however, a court must first determine whether the defendant is a fugitive. *Bescond*, 24
F.4th at 771.

There are two categories of fugitives: "(1) traditional fugitives and (2) constructive-flight
fugitives."  *Id.*  A traditional fugitive is "[a] person who, having committed a crime, flees from
[the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of
abode and conceals himself within the district." *Bescond,* 24 F.4th at 771 (alterations in original,
citations omitted).  When a defendant "actively resists extradition, or refuses to appear at his
arraignment, he has constructively fled the United States and thus is a fugitive."  *Eng*, 951 F.2d at
466.  That is particularly so if the defendant was physically present in the United States at the time
of the crime.  *See United States v. Hayes,* 118 F. Supp. 3d 620, 625 (S.D.N.Y. 2015) ("defendants
'constructively flee' when they were present in the jurisdiction at the time of the alleged crime,
they subsequently leave the jurisdiction, and they decide not to return upon learning they are
wanted by the authorities.").

When assessing whether a defendant is a fugitive:

> The intent to flee from prosecution or arrest may be inferred from a
> person's failure to surrender to authorities once he learns that
> charges against him are pending. This is true whether the defendant
> leaves the jurisdiction intending to avoid prosecution, or, having
> learned of charges while legally outside the jurisdiction,
> "constructively flees" by deciding not to return.

*United States v. $45,940 in United States Currency*, 739 F.2d 792, 796 (2d Cir. 1984), *abrogated on other grounds by Degen*. A defendant can be a fugitive "even when he does not 'flee' but is simply found outside the jurisdiction." *In re Grand Jury Subpoenas dated March 9, 2001*, 179 F. Supp. 2d at 287. The Second Circuit has similarly noted that "[a] person can be said to be a fugitive when, while abroad, they learn that they are under indictment and make no effort to return to the United States to face charges." *United States v. Blanco*, 861 F.2d 773, 779 (2d Cir. 1988). Boiled down to its essence, "[f]ugitivity implies some action by [a defendant] to distance herself from the United States or frustrate arrest." *Bescond*, 24 F.4th at 771.

After determining whether a defendant qualifies as a fugitive, the court considers whether disentitling the fugitive would serve the objectives of the fugitive disentitlement doctrine. *Id.* (citing *Finkelstein*, 111 F.3d at 280). Those objectives are: "(1) assuring the enforceability of any decision that may be rendered against the fugitive; (2) imposing a penalty for flouting the judicial process; (3) discouraging flights from justice and promoting the efficient operation of the courts; and (4) avoiding prejudice to the other side caused by the defendant's escape." *Id.* at 141-42 (citing *Finkelstein*, 111 F.3d at 280); *see also United States v. Zedner*, 555 F.3d 68, 77 (2d Cir. 2008) (listing four objectives of fugitive disentitlement doctrine). Any one of these justifications can serve as a basis for applying the doctrine. *See SEC v. Berger*, 322 F.3d 187, 191 (2d Cir. 2003), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) ("In the past, we advanced four *independent* grounds for disentitling fugitives" (emphasis added); and noting that *Degen* indicated that the first and fourth justifications are "the most persuasive"); *cf. Gao v. Gonzales*, 481 F.3d 173, 176 (2d Cir. 2007) ("[A]ny one of these rationales provides a sufficient basis . . . to dismiss the appeal.").

14

In *Bescond*, the Second Circuit reversed a decision of the district court that applied the fugitive disentitlement doctrine to decline to consider Bescond's motion to dismiss an indictment. The indictment charged Bescond with violating the Commodity Exchange Act and conspiracy to do so for her conduct in a scheme to manipulate the United States Dollar London Interbank Offered Rate ("LIBOR") from abroad. Concluding that there was appellate jurisdiction under the collateral order doctrine, the Second Circuit held that the district court had erred both in classifying Bescond as a fugitive and in applying the fugitive disentitlement doctrine in her case.

As to her status as a fugitive, the Second Circuit held that Bescond was not a fugitive because she lived in France, was "never here" in the United States, had virtually no connection to the United States, and had taken no "action . . . to distance herself from the United States or frustrate arrest." 24 F.4th at 771, 774. Bescond's "presence abroad [was] unrelated to the American prosecution." *Id.* at 773. Bescond did not qualify as a constructive-flight fugitive, the Second Circuit concluded, because she "was not in the United States while allegedly committing the charged conduct" and did not then "refus[e] to return to the United States to avoid prosecution." *Id.* at 772.

The Second Circuit further concluded that even if Bescond were properly classified as a fugitive, the district court had abused its discretion in applying the doctrine for similar reasons: Because Bescond had no other reason to travel to the United States, disentitlement was too harsh a means of assuring the enforceability of the court's decisions; Bescond was not flouting the judicial process, but simply "stay[ing] home"; Bescond's behavior would not incentivize other fugitives to fail to submit to a court's jurisdiction; and the Government was not prejudiced specifically by Bescond's absence, such that the objectives of the fugitive disentitlement doctrine did not favor applying it to Bescond's case. *Id.* at 773-775. The panel noted that its holding was

15

limited and should not be cast in "broad terms," and that "[a] different result may obtain if a person's presence abroad is any part covert or suspect: a hideout, sanctuary, or escape from the reach of law." *Id.* at 770 n.6, 773.

## B.  Argument

Under the fugitive disentitlement doctrine, Bardakova should not be allowed to flout the Court's authority and not submit to its jurisdiction, while simultaneously asking the Court to consider and adjudicate her motion to dismiss the pending charges.  The Court should therefore deny her motion without addressing the merits.

### 1.  Bardakova Is a Fugitive under Second Circuit Law

Bardakova clearly qualifies as either a traditional fugitive or a constructive-flight fugitive under Second Circuit law.  Unlike Bescond, who "was not in the United States while allegedly committing the charged conduct", 24 F.4th at 772, Bardakova is a traditional fugitive in that she came to the United States and was approached by law enforcement in the middle of actively committing the charged conduct—helping her sanctioned employer conduct hundreds of thousands of dollars of financial transactions in the United States.  After the FBI's approach, Bardakova knew that the FBI was investigating her role in helping Deripaska evade sanctions. Bardakova knew that she lied to the FBI.  She knew there was a criminal grand jury investigation in the Southern District of New York requiring her testimony forthwith, or in lieu of that forthwith testimony, the production of her personal electronic devices.  Bardakova also knew, or should have known, that the phones she surrendered would have evidence of her own communications and transactions in the United States as part of this conspiracy.  Bardakova then quickly took "action . . . to distance herself from the United States or frustrate arrest." *Id.* at 771.  She left knowing that she had just committed additional crimes by lying to the FBI, and before she could be charged.

While Bardakova claims that like Bescond, she "simply remains" at home in Russia (Def. Mem. 19), and is not actively refusing to submit to the Court's jurisdiction by not returning to the United States, Bardakova has made clear that she understands that if she returned to the United States "she would almost certainly be arrested on arrival (if not before)." (Def. Mem. 21). That is precisely the definition of a fugitive: if not for the consequences stemming from her alleged criminal conduct here, Bardakova would have had no reason to refuse to return. Unlike Bescond, Bardakova was essentially caught red-handed in the middle of committing a crime in the United States, and fled within mere days to a non-extraditable jurisdiction before she could be charged and arrested. Bardkova's case is thus a far cry from Bescond, who took no active steps whatsoever to evade United States jurisdiction.

Bardkova's case is also further distinguishable from *Bescond* because – unlike the defendant in *Bescond* – Bardkova has extensive other ties to the United States (a fact that goes conspicuously unmentioned in her brief). Unlike defendants challenging fugitive disentitlement who have "never been in the country," *Bescond*, 24 F.4th at 772 (quoting *In re Hijazi*, 589 F.3d 401, 412 (7th Cir. 2009)), prior to her flight, Bardakova visited the United States more than ten times, and sometimes multiple times a year. Indeed, Bardakova's own son is a U.S. citizen, a status he acquired when Bardakova herself travelled to the United States in 2013 for three months to give birth to him in New York.

Bardokova's crime is also inherently a United States-based offense, unlike Bescond who simply committed a violation of the Commodity Exchange Act in her role as a banker at a bank based in France. The crux of Bardakova's offense is a conspiracy to violate U.S. sanctions, by employing a U.S. person, who resided in the United States, to conduct millions of dollars transactions in the United States, including the sale of U.S. property and the purchase of U.S.

products and services, further facilitated by Bardakova's own travel to the United States and her separate crime of lying to the FBI in the United States. Indeed, Bardakova's own extensive ties to the United States are inexorably intertwined with the sanctions violations she is charged with. Bardakova was well positioned to help Deripaska evade sanctions as part of the birth-tourism scheme, for example, because of her own personal experience doing the same here. These facts squarely and materially distinguish Bardakova from the defendant in *Bescond*. *See Bescond*, 24 F.4th at 774 (concluding that there existed "no reason" for Bescond to travel to the United States, because the Government had "not shown that she has residence, immigration status, job, or family in this country").

In addition to her reliance on *Bescond*, Bardakova also cites *United States v. Cornelson*, 595 F. Supp. 3d 265 (S.D.N.Y. 2022). (Def. Mem. 18-21). But that case also does not support Bardakova's position. The court reasoned that Cornelson was not a fugitive because it was "undisputed that Mr. Cornelson was not in the United States at the time of the acts alleged in the Indictment, and that he has not been in the United States since May 2012, more than three years prior to his Indictment." These facts stand in stark contrast to those presented here. Bardakova was physically in the United States committing certain overt acts charged in the IEEPA conspiracy, and all of the acts in the false statements charge. Moreover, the core of her scheme also involved causing another co-conspirator to take acts while located in the United States. And whereas Cornelson last visited the United States more than three years before being notified that he was sought by U.S. authorities, Bardakova purposefully absented herself from the United States mere days after she was located by the FBI who had served her a grand jury subpoena, and to whom she made multiple material misstatements about her past and ongoing crimes on behalf of Deripaska.

2.  Disentitling Bardakova Serves the Objectives of the Fugitive Disentitlement Doctrine

Disentitling Bardakova would also serve the four objectives of the doctrine, any one of which can independently provide a basis for applying the doctrine. *See Bescond*, 24 F.4th at 773-774, *Zedner*, 555 F.3d at 77.

First, doing so would be consistent with assuring the enforceability of any judgment rendered against Bardakova. *See Bescond*, 24 F.4th at 774. Disentitlement is the only means of avoiding the "heads I win, tails you'll never find me" posture that the disentitlement doctrine guards against. *See id.* (quoting *Gao*, 481 F.3d at 177; *Antonio-Martinez v. I.N.S.*, 317 F.3d 1089, 1093 (9th Cir. 2003)). There is no mutuality where, as here, a ruling in Bardakova's favor on the motion to dismiss would dispose of the case, and a ruling against Bardakova would have no adverse effect on her, instead permitting her to maintain the status quo. In *Bescond*, the court viewed disentitlement as "too harsh a means of ensuring mutuality in the litigation," *id.* at 142, in light of Bescond's particular circumstances—specifically, because Bescond "allegedly committed the charged offense entirely from abroad" and had "no reason" to travel to the United States" and no "residence, immigration status, job, or family in this country." *Id.* As discussed above, Bardakova's circumstances are entirely different. Disentitling a defendant such as Bardakova, who indisputably committed crimes in the United States—and in fact *came to* the United States to commit those crimes, who previously spent as much as three months living in the United States, whose child is a citizen, who has travelled here more than ten times, and who actively avoids capture by U.S. law enforcement by fleeing the United States after encountering law enforcement for a country that will not extradite her and thereafter ceasing travel here, is, in contrast, not "disproportionately severe." *Bescond*, 24 F.4th at 774.

Notably, Deripaska is charged in the same Indictment as Bardakova and would stand to potentially benefit from a resolution on the merits of Bardakova's challenge to the Indictment. Allowing a defendant to flout U.S. sanctions by sending a co-conspirator to the United States from Russia to engage in hundreds of thousands of dollars of unlawful transactions on his behalf, lie to U.S. law enforcement to conceal the scheme, and then litigate from Russia the merits of the Indictment in which both he and the co-conspirator are named would be a paradigmatic example of a defendant "gam[ing] the system," which this prong of the fugitive entitlement analysis is meant to address. *See Bescond*, 24 F.4th at 774. The first justification—one of the two "most persuasive," *see Berger*, 322 F.3d at 192—thus counsels strongly in favor of applying the doctrine and disentitling Bardakova.

Second, applying the doctrine here would rightly impose a penalty for Bardakova's flouting the judicial process. *See Bescond*, 24 F.4th at 774. This is not a case where the defendant has simply stayed home "where she remained during the allegedly criminal scheme". *Id.* Bardakova plainly exhibited disrespect for U.S. law by coming to the United States to commit crimes, actually committing two separate charged crimes while in the United States, fleeing the United States after lying to law enforcement, and refusing to return for approximately 15 months (and running) since being charged. Bardakova is squarely within the "class of persons traditionally recognized as 'fugitives,' that is, persons who allegedly committed crimes while in the United States but who were outside the country—for whatever reason—when they learned that their arrests were sought and who then refused to return to the United States in order to avoid prosecution." *Collazos v. United States*, 368 F.3d 190, 199 (2d Cir. 2004); *see also Blanco*, 861 F.2d at 779 ("A person can be said to be a fugitive when, while abroad, they learn that they are under indictment and make no effort to return to the United States to face charges.").

Third, and relatedly, allowing Bardakova to challenge the Indictment while remaining abroad would incentivize the sort of behavior Bardakova has exhibited here in evading justice and would damage the "efficient operation of the courts." *Bescond*, 24 F.4th at 774. Unlike Bescond, who "was never here" and whose charged LIBOR manipulation offense was characterized by the Second Circuit as "financial, diffuse, and novel, and . . . affected the United States—allegedly— only through a chain of other actors in other countries," Bardakova personally committed crimes while located in the United States, targeted the United States sanctions regime from Russia by passing instructions and hundreds of thousands of dollars in illegal funding to a U.S.-based subordinate unlawfully employed by Deripaska (*i.e.* Shriki), and through the subordinate, helped Deripaska conduct a wide panoply of unlawful conduct in the United States, including a multi-million dollar sale of his U.S. property.

While "given Bescond's circumstances, there exists no cohort of fugitives who would perceive an adjudication of her motions as inducement or inspiration to flee the jurisdiction of our courts," *id.* at 142, that is not at all the case here: countenancing and considering Bardakova's motion would incentivize those, like her and her sanctioned employer, who have committed U.S. crimes, including while physically present in the United States, and have substantial connections both to the United States and abroad, to voluntarily absent themselves from this country to avoid the reach of U.S. authorities, and instead seek to contest the charges from a safe distance in a non-extradition country. That is anathema to the U.S. criminal justice system, and precisely what the fugitive disentitlement doctrine seeks to prevent. This is all the more true in this case where Bardakova was found to be committing crimes in the United States before fleeing. An adjudication on the merits here would signal to powerful sanctioned individuals living in non-extraditable jurisdictions that unlawfully sending their subordinates to the United States to engage in

transactions on their behalf and then returning abroad at the first sign of detection will only redound to their benefit.

Fourth, and finally, Bardakova's fugitive status works considerable prejudice against the Government. *See id.* at 774-775.  For starters, as time goes by, memories can fade and evidence can grow stale. The Government's inability to present its case against someone who used to regularly travel here but now refuses to travel here to avoid arrest is no minor inconvenience. Instead, it is prejudice caused directly by the defendant's unwillingness to return to the country to face justice for conduct that occurred in the United States and directly undermined U.S. sanctions on Russian oligarchs and their facilitators at a pivotal time in our nation's foreign policy toward that country.  Furthermore, were the Court to allow Bardakova to challenge the Indictment from the safety of a non-extraditable country, it would force the Government to spend resources to litigate the merits of the charges (not to mention use of the Court's resources) when Bardakova is not subjecting herself to the jurisdiction of the Court.

Courts in this district have not hesitated to apply disentitlement even on defendants who (unlike Bardakova) committed crimes entirely from abroad, and did not leave the country days after being alerted of a criminal investigation into them by law enforcement.  *See, e.g.*, *United States v. Lopez Bello*, No. 19 CR. 144 (AKH), 2023 WL 3199968, at *1 (S.D.N.Y. May 2, 2023) (applying fugitive disentitlement to sanctioned defendant who moved out of the United States after being sanctioned and subsequently committed sanctions evasions from abroad); *Hayes*, 118 F. Supp 3d at 627 (disentitling defendant who committed crime while physically located outside of the United States); *United States v. Fox*, 10 Cr. 318 (DLC), 2020 WL 4177796, at *1 (S.D.N.Y. Jan. 27, 2020) (disentitling defendant who did not actually flee from the judicial district in which he was indicted but chose to remain beyond he reaches of the warrant while abroad).

The outcome is clear under *Bescond* and the other applicable law outlined above: Bardakova is a fugitive who "committed crimes while in the United States," 24 F.4th at 772—and each of the relevant factors weighs in favor of applying the fugitive disentitlement doctrine and declining to consider her motion on the merits.

## IV.    Bardakova's Motion Would Fail On the Merits

The Court need not—and should not—reach the merits of Bardakova's motion, given her status as a fugitive and the compelling grounds calling for disentitlement here.  The Government notes, however, that it is apparent that her motion would fail on the merits.

### A.  Venue is Proper in the Southern District of New York

Bardakova argues that venue is improper in the Southern District of New York for Count Three of the Indictment, which charged Bardakova with making false statements to FBI agents during an interview in Los Angeles.  Bardakova's claim is meritless.  Because the Indictment sufficiently alleges venue on its face, and because in any event, Bardakova's false statements were transmitted to and relied upon in the Southern District of New York, venue is proper in this District.

#### 1.    Applicable Law – Motions to Dismiss on Venue Grounds

Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Cr. P. 7(c)(1).  "A defendant seeking to challenge the sufficiency of an indictment on a motion to dismiss faces a high hurdle."  *United States v. Silver*, 117 F. Supp. 3d 461, 464–65 (S.D.N.Y. 2015); *see also United States v. Pham*, 2022 WL 993119, at *3 (S.D.N.Y. Apr. 1, 2022) (Nathan, J.) ("A defendant faces a high standard in seeking to dismiss an indictment." (citation omitted)).  "An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead

an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also id.* ("[A]n indictment need 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" (citation omitted)).  Thus, "the Court will not look beyond the face of the indictment and draw inferences as to proof to be adduced at trial, for the sufficiency of the evidence is [generally] not appropriately addressed on a pretrial motion to dismiss." *United States v. Bankman-Fried*, 2023 WL 4194773, at *7 (S.D.N.Y. June 27, 2023); *accord United States v. Phillips*, No. 22-CR-138 (LJL), 2023 WL 5671227, at *4 (S.D.N.Y. Sept. 1, 2023).

Since the venue requirement is not an element of the crime, it need be proved only by a preponderance of the evidence.  *See United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007). "Where venue is challenged on a pre-trial motion to dismiss, the Government's burden is limited to showing that the indictment alleges facts sufficient to support venue." *United States v. Peterson*, 357 F. Supp. 2d 748, 751-52 (S.D.N.Y. 2005) (citing *United States v. Szur*, No. S5 97 Cr. 108 (JGK), 1998 WL 132942, at *9; *United States v. Korolkov*, 870 F. Supp. 60, 63-64 (S.D.N.Y. 1994)).  *See also United States v. Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006) ("[A]s long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied.").  At this initial stage, the government need only "allege that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information," and the question of whether there is sufficient evidence to establish venue is left for trial.  *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010) (internal quotations and citations omitted).

2.   Applicable Law – False Statements

The federal false statements statute, 18 U.S.C. § 1001(a), makes it a crime, inter alia, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . [to] make[ ] any materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a)(2).  "Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be ... prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a).

It is settled law in this Circuit that when false statements are made in one district and then transmitted to another district, the offense is continuing for purposes of 18 U.S.C. § 3237(a) and, therefore, venue is proper in both the district where the statement was made and the district in which it was received. *United States v. Coplan*, 703 F.3d 46, 78, 80, (2d Cir. 2012) ("the instant offense case began in Tennessee, where Vaughn made the false statements to IRS officials, but continued into the Southern District of New York, where his deposition transcript was reviewed and discussed by IRS officials"); *see United States v. Candella*, 487 F.2d 1223, 1228 (2d Cir. 1973) (false statements in fraudulent affidavits submitted to the City of New York's municipal branch office in Brooklyn and then conveyed by it to the Housing and Urban Development office in Manhattan sufficed to create venue in the Southern District of New York); *United States v. Ramirez*, 420 F.3d 134, 143 (2d Cir. 2005) (holding that venue for a violation of Section 1001 lay in the Southern District of New York where statements made in New Jersey were subsequently transmitted to Manhattan); *see also United States v. Salinas*, 373 F.3d 161, 166-67 (4th Cir. 2004) ("When materiality is a critical component of the statutory definition [as in Section 1001], it makes perfect sense to consider the crime as continuing into the district in which the effects of the false statement are felt.")

"Under § 1001, a statement is material if it has a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed, or if it is capable of distracting government investigators' attention away from a critical matter." *United States v. Adekanbi,* 675 F.3d 178, 182 (2d Cir. 2012) (internal citations, quotation marks, and alterations omitted). "Accordingly, whether [the defendant's] false statements were material turns on the tendency or capacity of those statements to influence the decision making body at issue"— in this case, the FBI conducting an investigation in the Southern District of New York. *Coplan,* 703 F.3d at 79.

3.  Discussion

Bardakova claims that venue does not lie in the Southern District of New York on Count Three because her crime of making false statements to FBI agents in California was "completed" exclusively in California as soon as she had finished speaking to the agents. (Def. Mem. 6-7). Bardakova is wrong. The Indictment sufficiently alleges venue, and in any case, her false statements were transmitted to and relied upon in the Southern District of New York, making venue here proper.

First and foremost, the motion must be denied because the Indictment more than adequately alleges venue in the Southern District of New York. Indeed, the Indictment's statutory allegations that acts took place "in the Southern District of New York and elsewhere", Ind. ¶ 29, are alone sufficient to defeat a motion to dismiss. *See, e.g., United States v. Milton*, No. 21 CR. 478 (ER), 2021 WL 5304328, at *4 (S.D.N.Y. Nov. 15, 2021) ("The government counters that Milton's arguments are not relevant on a motion to dismiss, at which stage the indictment need only allege, as in the instant indictment, that the charged crime occurred 'in the Southern District of New York and elsewhere'. . . . On a motion to dismiss the indictment, the allegations of the indictment are taken as true. . . . In order to properly plead venue at this stage, the government [ ]need only allege

26

that criminal conduct occurred within the venue, [ ]even if phrased broadly. . . . That is all the government needs to allege at this stage in order to sufficiently plead venue. . . . Whether the government will ultimately be able to prove venue by a preponderance of the evidence is a question of fact to be decided by the jury.") (quotations and citations omitted); *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010) ("In each count of the Indictment, the Government alleges that the offenses occurred 'in the Southern District of New York and elsewhere.' . . . These allegations alone are sufficient to survive a pretrial motion to dismiss. The question of whether there is sufficient evidence to support venue is appropriately left for trial."). Thus, the Court can and should deny the motion based on the face of the allegations in the Indictment alone.

Moreover, the alleged misconduct goes well beyond what is required to defeat a motion to dismiss on venue grounds. Bardakova made false statements to FBI agents engaged in a grand jury criminal investigation of Deripaska in the Southern District of New York. Bardakova's false statement offense began in California and continued when the FBI agents returned to the Southern District of New York. The FBI agents also transported her false statements back into the Southern District of New York and relied on those statements in proceeding with its investigation in this District and ultimately securing charges against Bardakova in this District.

In *Coplan*, which is squarely on point with Bardakova's case, the defendant made false statements to the IRS in a deposition in Tennessee, the transcript of which was subsequently reviewed by IRS investigators working in Manhattan, and was convicted at trial. 703 F.3d at 78-79. The Second Circuit reasoned that venue for false statements was proper in the Southern District of New York because "[p]roving the materiality of [defendant's] false statements in Tennessee necessarily requires evidence that those statements were conveyed to or had an effect on the IRS investigators working in the Southern District of New York." *Id.* at 79 (citing *Oceanpro,*

674 F.3d at 329; *United States v. Salinas,* 373 F.3d 161, 167 (1st Cir. 2004) ("When materiality is a critical component of the statutory definition, it makes perfect sense to consider the crime as continuing into the district in which the effects of the false statement are felt.")); *United States v. Ringer,* 300 F.3d 788, 792 (7th Cir. 2002) (finding venue in the district where the investigation was "reasonably likely to be affected by [the defendant's] statements")).  The same analysis holds true here.  The fact that Bardakova's statements "'continued to be false and continued to be in the jurisdiction of the United States when they finally reached Manhattan confirms . . . that venue was proper in the Southern District of New York."  *Coplan*, 703 F.3d at 80 (internal citations and quotations omitted); *accord Candella*, 487 F.2d at 1228, *Ramirez*, 420 F.3d at 143 (2d Cir. 2005).[5]

### B.  Count One Does Not Violate Due Process or IEEPA

Bardakova next argues that Count One violates due process because a portion of the overt acts alleged in the Indictment relates to transactions that benefited Voronina and Deripaska's child and that "no reasonable person would understand that actions taken for the benefit of a woman and her unborn child—who are not subject to any U.S. sanctions . . . were prohibited under the Ukraine-Related Executive Orders of 31 C.F.R. § 589.201."  (Def. Mem. 11.)  Bardakova elides the actual allegations in the Indictment.  There is no basis to dismiss Count One on due process grounds or otherwise.

---

[5] Bardakova also invokes the "substantial contacts tests" to argue that venue for the false statement count alone—but not Count One—is present only in California.  (Def. Mem. 8-9).  That too is inappropriate to resolve on a motion to dismiss, as evident by the fact that each case cited by Bardakova arises post-conviction, after the Government had an opportunity to present evidence.  In any case, there is no tangible hardship or prejudice to Bardakova to be tried on all counts against her in the Southern District of New York, as opposed to facing a separate prosecution in California on the false statements charge alone, and the substantial contacts analysis would strongly favor this District.  *See Coplan*, 703 F.3d at 80 (affirming substantial contacts analysis for defendant whose out-of-district false statements to investigators were ultimately conveyed to and reviewed by investigators working in the Southern District of New York).

1.  Applicable Law

The indictment must provide "a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c)(1). "An indictment must sufficiently inform the defendant of the charges against him and provide enough detail so that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001). "An indictment, however, need not be perfect, and common sense and reason are more important than technicalities." *Id.* "Dismissal is only appropriate 'in very limited and extreme circumstances . . . .'" *United States v. Griffith*, 515 F. Supp. 3d 106, 112–13 (S.D.N.Y. 2021) (quoting *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979)). Dismissal "is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *De La Pava*, 268 F.3d at 165. "A pretrial motion to dismiss an indictment must not weigh the sufficiency of the evidence." *Griffith*, 515 F. Supp. 3d at 113 (citing *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998)).

2.  Discussion

The indictment provides Bardakova with adequate notice of the charges against her and protects against the risk of double jeopardy. *Griffith*, 515 F. Supp. 3d at 113. In *Griffith*, this Court denied a motion to dismiss an Indictment that, like the instant Indictment, sufficiently alleged a conspiracy to violate IEEPA. The comprehensive twenty-four page speaking Indictment charging Bardakova "on its face alleges the time period of the offense" (in or about April 2018 through the date of the Indictment for Count One), "the place of the offense" (this District, and elsewhere), "the participants in the conspiracy" (Bardakova, Deripaska, Shriki, and others known and unknown), the "objects of the conspiracy" ("would and did violate, attempt to violate, and cause a violation of a license, order, regulation, and prohibition issued under the IEEPA"), *id.* at 113, and even extensively discusses multiple overt acts in furtherance of that conspiracy. "It

29

further alleges the laws" (50 U.S.C. § 1705), "regulations" (31 C.F.R. § 589.201) and "Executive Orders" (13660, 13661, and 13662) "that [Bardakova] is charged with having violated. *Id.*

Bardakova's challenge to the conspiracy count of the Indictment is predicated on arguing that certain overt acts related to the birth citizenship scheme by themselves do not constitute a crime under the due process clause and IEEPA. But Count One alleges a straightforward four-year conspiracy pursuant to which Bardakova agreed to help Deripaska employ a U.S. citizen to perform services for Deripaska in violation of sanctions, which was unlawful on its face. Ind. ¶ 19; *see* Executive Order 13660, Sec. 4(a) (prohibiting the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked). As alleged, and separately illegal, Bardakova also helped to funnel hundreds of thousands of dollars from Deripaska to that U.S. citizen in order to pay for various services post-sanctions. Ind. ¶ 19 & 19(f), *see* Executive Order 13660, Sec. 4(b) (prohibiting the receipt of any contribution or provision of funds, goods, or services from any such sanctioned person). The services included such undisputed sanctions-violative conduct as selling Deripaska's music studio in the United States for over three million dollars and buying goods for Deripaska's personal use. Ind. ¶ 19 (a) & (c).

A person of ordinary intelligence would reasonably understand that a statute prohibiting a sanctioned oligarch from obtaining services from a U.S. person and providing funding to that U.S. person means what it says, and that Bardakova's agreement to help Deripaska to employ Shriki was illegal. Tellingly, the allegations in the Indictment demonstrate Bardakova's own understanding that what she was doing was unlawful. When the FBI questioned Bardakova about Voronina's 2020 trip to the United States to give birth to her first child with Deripaska, Bardakova prevaricated that she provided no assistance, and explicitly denied sending money from her own

accounts to pay for related expenses. Ind. ¶ 22, 29. In actuality, as alleged, Bardakova used funds from her personal bank account in Russia to pay thousands of dollars of payments to various service providers for the benefit of Deripaska and Voronina in the United States in 2020. Ind. ¶ 19(f). And in light of the allegation Deripaska actually approved and provided funding for these arrangements related to the birth in 2020 of his child in the United States, *id.*, it is self-evident that Bardakova attempted to conceal Deripaska's role and her own misconduct—by using her bank account, and by later lying about it to the FBI. It bears noting that two years later, Voronina herself allegedly lied to U.S. immigration officials about who was funding her return stay, pretending that her parents, rather than Deripaska, rented her luxury housing rental. Ind. ¶ 31. These are not the actions of persons who innocently or reasonably believed that Deripaska's birth tourism scheme was exempt from sanctions, much less that it was lawful for anyone to help Deripaska expend hundreds of thousands of dollars in the United States and employ a U.S. person, so long as some of the services provided to Deripaska related to a birth-tourism scheme.

In support of her motion for dismissal, Bardakova invokes the Berman Amendment to IEEPA, which in relevant part exempted "any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages". 50 U.S.C. § 1702(b)(4). Bardakova does not cite any legal authority interpreting the travel exemption in Section 1702(b)(4), and invites the Court to credit the absurd notion that Deripaska's payments of hundreds of thousands of dollars for two separate six-month luxury housing rentals, five nannies and a housekeeper, cord blood and placenta preservation, Shriki's generalized services, and a whole host of other non-travel-related expenses detailed in the

Indictment is "ordinarily incident to travel to or from any country."  50 U.S.C. § 1702(b)(4).  This argument does not survive a plain reading of the statute and the allegations in the Indictment.

Section 1702(b)(4) was enacted as part of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103–236, 108 Stat. 474 (1994).  In Section 525 of that Act, entitled "Free Trade in Ideas," Congress explained its view that, in exercising his powers under IEEPA, "the President should not restrict travel or exchanges for informational, educational, religious, cultural, or humanitarian purposes or for public performances or exhibitions, between the United States and any other country."  *Id.* § 525(a).  Congress thus sought to permit "Americans to educate themselves about the world by communicating with peoples of other countries in a variety of ways, such as by sharing information and ideas with persons around the world, traveling abroad, and engaging in educational, cultural and other exchanges with persons from around the world."  H.R. Conf. Rep. 103-482, *as reprinted in* 1994 U.S.C.C.A.N. 398, 482.

Among other provisions aimed at this goal, Congress provided that the President could not, using IEEPA, bar "transactions ordinarily incident to travel to or from any country" or "arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages."  Pub. L. 103-236, § 525(c)(1), 108 Stat. 474 (codified at 50 U.S.C. § 1702(b)(4)).  That provision "prohibit[s] restrictions of any kind, including currency restrictions, on travel and transactions ordinarily incident to travel by Americans under embargoes implemented pursuant to the IEEPA."  House Conf. Rep. 103-482, *as reprinted in* 1994 U.S.C.C.A.N. 398, 483.  The legislative history explains that "[t]his is a further effort to protect Americans' constitutional rights and to facilitate international freedom of movement."  *Id.*

Nothing in Section 1702(b)(4) allows a person to enter a conspiracy to be employed by, funded by, and provide broad services to, a designated person, including services having nothing

to do with travel.  The objects of the alleged conspiracy in the Indictment include that Bardakova "and others known and unknown, would and did violate, attempt to violate, and cause a violation, or a license, order, regulation, and prohibition issued under the IEEPA" by "provid[ing] funds, goods, and services for the benefit of Deripaska and companies owned and controlled by Deripaska" and "receiv[ing] funds, goods, and services from Deripaska."  Ind. ¶¶ 19, 25 (capitalization omitted).  Deripaska allegedly "used Shriki's and Bardakova's assistance to engage in several [unlawful] endeavors in the United States" including (1) selling a music studio and attempting to remit over $3 million to a Russian bank account belonging to a Deripaska-controlled entity; (2) purchasing and sending gifts on behalf of Deripaska in the United States and Canada; and (3) acquiring property from the United States for Deripaska's personal use.  Ind. ¶ 19.  Bardakova herself acknowledges that she is alleged to have provided services that were "not related to helping with travel and living arrangements for Ms. Voronina."  (Def. Mem. 16.)

Even focusing narrowly on the alleged birth-tourism, Section 1702(b)(4) does not help Bardakova.  Statutes, of course, are construed based on the plain meaning of their text.  *Springfield Hospital, Inc. v. Guzman*, 28 F.4th 403, 418 (2d Cir. 2022).  "In looking at a statute's plain meaning, [courts] also must consider the context in which the statutory terms are used, as '[courts] do not construe statutory phrases in isolation; [they] read statutes as a whole.'"  *Id.* (quoting *United States v. Morton*, 467 U.S. 822, 828 (1984)) (ellipsis omitted).  Where a word is not defined in the statute, it is given "its ordinary meaning, considering the commonly understood meaning of the statute's words at the time Congress enacted the statute, and with a view to their place in the overall statutory scheme."  *Id.* (internal quotation marks omitted).

Looking to the relevant text and statutory context, the travel exemption allows a person to travel for "informational, educational, religious, cultural, or humanitarian purposes or for public

performances or exhibitions, Pub. L. 103-236, § 525(c)(1), by permitting "transactions *ordinarily incident* to travel," 50 U.S.C. § 1702(b)(4) (emphasis added).  When used as an adjective, "incident" means "occurring or likely to occur especially as a minor consequence or accompaniment."  Incident, Merriam-Webster, www.merriam-webster.com/dictionary/incident (last accessed Dec. 22, 2023).  Thus, in *United States v. Herrera*, the Second Circuit explained that the term "practices incident to employment" referred only to the type of practice "necessary to the kind of employment generally" and not to any employment practices a defendant may happen to employ.  584 F.2d 1137, 1145 (2d Cir. 1978) ("Otherwise, all employers . . . would be without the statute.").  Here, "incident" is modified by "ordinarily," which means "in an ordinary manner or to an ordinary extent."  Ordinarily, Merriam-Webster, www.merriam-webster.com/dictionary/ordinarily (last accessed Dec. 22, 2023).  "Ordinary" means "of a kind to be expected in the normal order of events: routine, usual."  Ordinary, Merriam-Webster, www.merriam-webster.com/dictionary/ordinary (last accessed Dec. 22, 2023).  Thus, the plain meaning of "transactions ordinarily incident to travel" is transactions that routinely, in the normal course of events, necessarily accompany travel.

The transactions alleged as part of the birth-tourism portion of the scheme—hundreds of thousands of dollars expended by and on behalf of Deripaska on, among other things, a private hospital birth, a two-story penthouse for six months, and at least six dedicated nannies and housekeepers, all for the purpose of ensuring that a sanctioned oligarch's son would be born a U.S. citizen—are not "transactions ordinarily incident to travel."  To the contrary, it was the travel that was merely incident to the underlying U.S.-based transactions.

Bardakova seeks to elide this obvious conclusion by citing Section 1702(b)(4)'s references to "payment of living expenses" and "acquisition of . . . services for personal use."  But that

language, contained in an "including" clause, simply provides illustrative examples of "transactions ordinarily incident to travel." In general, terms in an "including" clause are merely illustrative of the term preceding the clause. *See Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) (an "including" clause introduces "illustrative application[s] of a general principle"); *Epsilon Electronics, Inc. v. Dep't of Treasury*, 857 F.3d 913, 923 (D.C. Cir. 2017) ("we see no reason to depart in this case from the usual rule that 'including' means 'for example.'"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 15, at 132 (2012) ("The verb to include introduces examples."). Thus, "acquisition of . . . services for personal use" may be a type of "transaction[] ordinarily incident to travel"—*e.g.*, a taxicab ride to the airport, a hotel room before a connecting flight, or currency exchange. But it does not follow that every acquisition of services post-travel is "ordinarily incident to travel." And, as explained above, the services at issue here were anything but ordinary and some occurred as late as six months after Voronina's initial entry in 2020.

In sum, Bardakova seeks to stretch the statute far beyond what its terms permit. Bardakova would construe Section 1702(b)(4) to allow any sanctioned oligarch to come to the United States (or send a subordinate) for any purpose, for any length of time, expend unlimited funds, and procure any personal services from any Americans while here, all because they had to travel to get here. But this is not what Congress provided when it exempted "transactions ordinarily incident to travel" in order to promote intercultural engagement for the American public.

In *Griffith*, the defendant argued that his speaking engagement in North Korea fell within another exception under the Berman Amendment known as the information exception. *Griffith*, 515 F. Supp. 3d at 115 (citing 50 U.S.C. § 1702(b)(3)). This Court noted, "significantly," that the defendant, like Bardakova, was not charged with a substantive violation of IEEPA, but a

conspiracy to violate IEEPA. *Id.* at 117. The Court denied the motion to dismiss the Indictment, holding that "[e]ven if Griffith's presentation at the conference, taken in isolation, did not qualify as the provision of services, or was exempt under the information exception, evidence at trial may be sufficient to demonstrate his guilt in conspiring to provide services." *Id.* Here, *a fortiori*, it is undisputed that the Indictment alleges a conspiracy involving services far beyond any conceivable connection to the travel exemption, such as Shriki's employment, the sale of Deripaska's music studio, and the purchase of products for and on behalf of Deripaska. Because Count One tracks the language of the statute and alleges all of the essential elements of the conspiracy, it is plainly sufficient.

## CONCLUSION

Bardakova is a fugitive from justice who continues to hide out in Russia after being confronted by law enforcement in the United States while actively committing crimes here. This Court should decline to consider her motion unless and until she submits to its jurisdiction.

Respectfully submitted,
DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Vladislav Vainberg
Assistant United States Attorney
Tel.: (212) 637-1029

Dated: December 27, 2023
New York, New York