UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| - v. - | ) |
| | ) |
| OLEG VLADIMIROVICH DERIPASKA, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

)    22 Cr. 518 (PKC)
)    ORAL ARGUMENT REQUESTED

———————————————————

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT
NATALIA BARDAKOVA'S MOTION TO DISMISS**

Dated: January 24, 2024
     New York, New York

MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO, P.C.
Robert J. Anello
Brian A. Jacobs
Courtney D. Morphet
565 Fifth Avenue
New York, NY 10017
Tel: (212) 856-9600

*Attorneys for Defendant*
*Natalia Bardakova*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ................................................................................................................................ 4

    I.    The Court Should Dismiss Count Three Because Venue Is Improper Here Where the Allegedly Criminal Conduct Occurred Exclusively in California and the Conduct Has No Substantial Contacts with New York ................................................................................. 4

    II.    The Court Should Dismiss Count One Because It Violates Due Process......................... 10

    III.    The Court Should Dismiss Count One Because the Vast Majority of the Alleged Conduct Is Exempted from IEEPA, and the De Minimis Remaining Conduct Cannot Support the Charge ............................................................................................................................ 13

    IV.    The Court Should Address this Motion On the Merits Notwithstanding the Fact that Ms. Bardakova is in Her Home Country Rather than in the District ....................................... 16

      A.    Ms. Bardakova is Not a Fugitive .................................................................................. 16

      B.    Policy Considerations Weigh Against Disentitling Ms. Bardakova ............................. 18

    CONCLUSION.............................................................................................................................. 21

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Mattel, Inc. v. Barbie-Club.com,*
   310 F.3d 293 (2d Cir. 2002) ................................................................................... 4

*Morales v. Trans. World Airlines, Inc.,*
   504 U.S. 374 (1992) ............................................................................................... 4

*United States v. Alfonso,*
   143 F.3d 772 (2d Cir. 1998) ............................................................................... 3, 5

*United States v. Bescond,*
   24 F.4th 759 (2d Cir. 2021) ........................................................................*Passim*

*United States v. Bin Laden,*
   146 F. Supp. 2d 373 (S.D.N.Y. 2001) ................................................................... 4

*United States v. Coplan,*
   703 F.3d 46 (2d Cir. 2012) ................................................................................. 5, 9

*United States v. Cornelson,*
   595 F. Supp. 3d 265 (S.D.N.Y. 2022) ............................................................. 16, 19

*United States v. Davis,*
   905 F.2d 245 (9th Cir. 1990) ............................................................................... 13

*United States v. Fortenberry,*
   89 F.4th 702 (9th Cir. 2023) ............................................................................... 8, 9

*United States v. Miller,*
   808 F.3d 607 (2d Cir. 2015) ............................................................................... 6, 7

*United States v. Saavedra,*
   223 F.3d 85 (2d Cir. 2000) ................................................................................. 6, 7

*United States v. Sampson,*
   898 F.3d 270 (2d Cir. 2018) ................................................................................... 3

*United States v. Yousef,*
   327 F.3d 56 (2d Cir. 2003) ................................................................................... 13

**Statutes**

50 U.S.C. § 1702(a) ............................................................................................ 15

50 U.S.C. § 1702(b) ............................................................................. 2, 13, 15, 16

**Rules**

Fed. R. Crim. P. 12(b)(3) ...................................................................................... 7

## PRELIMINARY STATEMENT

The government's ill-considered case against defendant Natalia Bardakova centers on her non-criminal efforts to help an unsanctioned woman give birth, and neither of the criminal charges the government has fashioned from her alleged conduct withstands scrutiny. In particular, this Court should dismiss the Indictment as to Ms. Bardakova because the two counts that name her as a defendant are both defective: Count Three's false statements charge is defective because venue is improper in the Southern District of New York, and Count One's International Emergency Economic Powers Act ("IEEPA") conspiracy charge is defective because it violates due process by attempting to criminalize conduct that is innocent, that took place outside the United States, and that is exempted by IEEPA. *See* Br. at 1-3.[1] The government's opposition brief, despite spanning 36 pages, largely ignores Ms. Bardakova's key arguments, misconstrues law that supports them, and tries to convince this Court to leave the Indictment intact. Each of the government's arguments, however, falters upon examination.

First, as to Count Three's venue problem, the government contends that it is sufficient that agents carried Ms. Bardakova's statement from California to the Southern District of New York, even though the Indictment does not allege that occurred. The government's position, moreover, would lead to the absurd result of enabling the government essentially to ignore the Constitution's venue requirement and to prosecute a defendant for a false statement in any venue in the country simply by having an agent travel to the venue with the statement. More importantly, the government's opposition brief ignores (except for a cursory footnote) the Second Circuit's requirement, which Ms. Bardakova set out in her opening brief, that

---

[1] "Br." refers to the Memorandum of Law in Support of Defendant Natalia Bardakova's Motion to Dismiss (Dkt. No. 35). "Gov." refers to the Government's Memorandum of Law in Opposition to Defendant Natalia Bardakova's Motion to Dismiss the Indictment (Dkt. No. 44).

"substantial contacts" exist between the offense conduct and the proper venue.  The substantial contacts test bars Ms. Bardakova's prosecution in the Southern District of New York and protects defendants from just the sort of abuse that occurred here.  Not only does the Indictment here fail to establish any substantial contacts between Ms. Bardakova's alleged conduct and this District, but the government in opposition—contrary to the clear requirements of Second Circuit case law—also does not even attempt to show that such contacts exist (despite relying on many other facts from outside the Indictment for other purposes).

Second, as to Ms. Bardakova's challenges to Count One's IEEPA charge, the government resorts to paraphrasing the Indictment to make it appear that Ms. Bardakova engaged in acts here in the U.S. that the Indictment actually alleges were committed by others (such as the sale of a music studio).  At the same time, the government substantially fails to respond to Ms. Bardakova's arguments that due process forbids her prosecution for helping an unsanctioned person give birth, and for conduct that took place entirely overseas.  The government also only meekly responds to Ms. Bardakova's assertion that the remaining alleged conduct was exempted from IEEPA (as incident to travel) by suggesting—without a basis in the text of the exemption or the case law—that the relevant exemption does not extend to luxury expenses (such as a private hospital room and nannies) incurred during travel, despite the fact that the plain language of the exemption states that the President's authority under the IEEPA "does not include the authority to regulate or prohibit, directly or indirectly," travel expenses including the "payment of living expenses and acquisition of goods or services for personal use."  50 U.S.C. § 1702(b)(4).  None of these arguments is persuasive.

Third, the government's opposition brief first tries to convince the Court that Ms. Bardakova is a "fugitive" who should be disentitled from challenging the Indictment.  The

government's basis for disentitlement, however, falls flat.  Although the government suggests that Ms. Bardakova is a "fugitive" who fled the country after speaking with agents in California, the reality (based on the government's own allegations) is that Ms. Bardakova spent just three days in the U.S., spoke voluntarily to federal agents, and then went home (to Russia) when she had no reason to remain in the U.S.  Disentitlement is further inappropriate because the vast majority of the conduct alleged in the Indictment occurred when Ms. Bardakova was at home in Russia, she does not have any significant ties to the U.S., she has no reason to travel here in the future, she has every reason to remain in the country in which she has resided her entire life, and the government itself chose to unseal the Indictment despite knowing she was overseas.

Finally, it bears noting that the government's opposition brief relies on a number of facts from outside of the Indictment, but without making the requisite "full proffer of the evidence." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998); *United States v. Sampson*, 898 F.3d 270, 282 (2d Cir. 2018).  For example, without giving anything close to a "full proffer," the government relies upon: (i) Ms. Bardakova's alleged receipt of a subpoena, Gov. 1; (ii) FBI agents allegedly carrying Ms. Bardakova's statement in California back to New York, Gov. 23; (iii) information regarding Ms. Bardakova's visa application, Gov. 10, n.4; and (iv) information regarding Ms. Bardakova's past travels to the U.S.  Absent a "full proffer" of evidence from the government, however, the Court should not rely on evidence from outside the Indictment to sustain the Indictment.

On the whole, the government's arguments fail to address the deficiencies in the Indictment that Ms. Bardakova's motion identified, and Ms. Bardakova should never have been charged in this case.  The Court should dismiss the Indictment as to Ms. Bardakova.

# ARGUMENT

## I.    The Court Should Dismiss Count Three Because Venue Is Improper Here Where the Allegedly Criminal Conduct Occurred Exclusively in California and the Conduct Has No Substantial Contacts with New York

As Ms. Bardakova demonstrated in her opening brief, "venue is improper in the Southern District of New York because the alleged false statements were 'completed' exclusively in California."  Br. 6.  The Indictment clearly alleges that the relevant statements were made after FBI agents met Ms. Bardakova "at the Los Angeles airport" and took her "back to her hotel where they interviewed her in the lobby."  Indictment ¶ 22.  Each of the alleged statements was "uttered and received wholly inside" another district, so there is "no basis for venue in the Southern District of New York."  *United States v. Bin Laden*, 146 F. Supp. 2d 373, 377 (S.D.N.Y. 2001) (Sand, J.) (dismissing false statements count where the charged offense "began, continued, and was completed in just one federal judicial district").

The government now argues that the Indictment's bare conclusory allegation that "acts took place 'in the Southern District of New York and elsewhere,'" Gov. 26 (quoting Indictment ¶ 29), is alone sufficient to satisfy the constitutional venue requirement.  The government ignores, however, the fact that the rest of both the Indictment and the government's brief make plain that the relevant acts did not take place "in the Southern District of New York" and only took place "elsewhere," namely, in California.  The Indictment—which the government itself boasts as a "comprehensive twenty-four page speaking Indictment," Gov. 29—describes the alleged California conduct in detail, and shows that all of the conduct relating to the false statements count took place in California.  Consistent with the interpretive principle that the specific governs the general (generalia specialibus non derogant), the government's detailed and specific allegations regarding acts in California override the conclusory general allegation about

the Southern District of New York.  *Cf. Morales v. Trans. World Airlines, Inc.*, 504 U.S. 374, 384-85 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general"); *Mattel, Inc. v. Barbie–Club.com*, 310 F.3d 293, 300 (2d Cir. 2002) (applying the canon of generalia specialibus non derogant, according to which general provisions do not qualify specific ones).

To attempt to remedy the absence of any New York conduct, the government's brief proffers that FBI agents "transported [Ms. Bardakova's] false statements back into the Southern District of New York and relied on those statements in proceeding with its investigation in this District."  Gov. 27.  As an initial matter, the Indictment does not allege that agents carried Ms. Bardakova's statements to New York in a supporting affidavit or other full proffer, as required, *see Alfonso*, 143 F.3d at 777.  Even if the government properly had presented these new facts, however, they are not sufficient to defeat Ms. Bardakova's motion.

In contending otherwise, the government relies on the Second Circuit's decision in *United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012), which found that venue was proper here for a false statements count even though the false statements were made in Tennessee because the statements were conveyed to agents in the Southern District of New York.  Gov. 27-28.  *Coplan*, however, does not save the Indictment because *Coplan* contains only half of the necessary analysis, and the court in *Coplan* was not presented with and did not address the substantial contacts test.  Unlike in the present case, the defendant in *Coplan* effectively conceded that his conduct had substantial contacts with the Southern District of New York, and did not challenge on appeal the district court's conclusion that those contacts weighed in favor of prosecution in the district.  *See Coplan*, 703 F.3d at 80 (noting that the defendant "does not appear to challenge the substance of [the district's court's] determination on appeal" that the "substantial contacts

analysis weighs in favor of venue in this district").

Here, by contrast, Ms. Bardakova's alleged conduct had no contacts whatsoever with the Southern District of New York, and the government has failed to indicate any such contacts in either the Indictment or its opposition brief.  In the absence of substantial contacts, the mere fact that agents may have carried Ms. Bardakova's statement from California to New York does not alone suffice to establish venue, and *Coplan* does not say otherwise.  *See United States v. Miller*, 808 F.3d 607, 622 (2d Cir. 2015) (when a defendant contests venue on the grounds of hardship, prejudice, or fairness, "we supplement our venue analysis with the 'substantial contacts' inquiry, . . . . in which we examine the offense's contacts with the forum district [which] 'offers guidance on how to determine whether the location of venue is constitutional, especially in those cases where the defendant's acts did not take place within the district selected as the venue for trial'" (quoting *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000)).

The government appears to recognize the weakness of its position on substantial contacts, and relegates the entire argument on this point to a footnote.  Gov. 28 n.5.  In that footnote, the government, ignoring the fact that venue is a constitutional requirement, argues that the question of substantial contacts "is inappropriate to resolve on a motion to dismiss" and suggests that "each case cited by Bardakova arises post-conviction, after the Government had an opportunity to present evidence."  Gov. 28 n.5.  The argument suffers at least three defects.

First, the government's protest that it wants the "opportunity to present evidence" in the future (of an unspecified character) rings hollow where elsewhere in its opposition brief, the government has taken pains to present evidence from outside the Indictment that it believes to be helpful.  *See supra* at 3.  The fact that the government has not offered the slightest evidence of *any* contacts between Ms. Bardakova's alleged conduct and the Southern District of New York,

let alone evidence of *substantial* contacts, only confirms what Ms. Bardakova argued in her opening brief—that no substantial contacts exist, and each of the substantial contacts factors weighs in favor of dismissal.  Br. 8-9.

Second, the government's position that an assessment of venue should wait until trial also runs headlong into Rule 12(b)(3)(A)(i) of the Federal Rules of Criminal Procedure, which identifies "improper venue" as a motion that "must be made *before trial*."  Fed. R. Crim. P. 12(b)(3)(A)(i) (emphasis added).  Ms. Bardakova's motion to dismiss properly raises the issue of venue pretrial, and the Court should not wait to evaluate the substantial contacts factors.  For this Court to force Ms. Bardakova to go through the entirety of a criminal case in an improper venue where the government has no evidence whatsoever that would satisfy the substantial contacts test is prejudicial in the very manner that the Constitution and the substantial contacts inquiry are meant to protect against.

Third, the government's contention that "each case cited by Bardakova arises post-conviction" is misleading.  Gov. 28 n.5.  The *appeals* in those cited cases "arose post-conviction" because that is when defendants can appeal adverse rulings, but in multiple of the cited cases, the defendant first argued venue was improper *pretrial*, just as Ms. Bardakova has done here.  *See Miller*, 808 F.3d at 611-12 (noting defendant "entered a plea of not guilty" and "then moved to dismiss the indictment for, *inter alia*, improper venue"); *Saavedra*, 223 F.3d at 86 ("Prior to trial defendants moved to dismiss the charges against them because of improper venue").

The Second Circuit's reasoning for affirming venue in *Miller* is instructive.  The defendant there was convicted of aiding and abetting the removal of a child from the United States, and the Court discerned "several sources of constitutional comfort" for affirming that the

District of Vermont was the proper venue, where the individuals the defendant aided and abetted "sought civil union status under Vermont law;" "sought the refuge and adjudication of the Vermont Courts;" and the child's removal "directly affected ongoing custody proceedings in Vermont courts" and "Vermont-rooted parental rights[.]"  808 F.3d at 622.  The Second Circuit concluded that the crime the defendant was found to have aided and abetted "had many, and substantial, connections with [Vermont]."  The same many and substantial connections are not present here.  The Indictment lays out the connections exclusively to California in great detail, explaining how the birth arrangements involved "obstetrical care while VORONINA was in Los Angeles, California" and the "rental of a two-story penthouse apartment in Beverly Hills, California," and how the alleged false statements also took place in California starting "at the Los Angeles airport" and ending at a nearby hotel.  Indictment ¶¶ 19(e), (f), (j), 22, 29.  As explained in Ms. Bardakova's opening brief, based on the Indictment's California-focused allegations, each of the substantial contacts factors weighs in favor of dismissal where the "site" of the alleged acts is California; the "elements and nature of the crime" relate to one interview conducted wholly in California; the "effect" of the conduct was felt by the FBI agents in California; and California is the only suitable venue for "accurate factfinding."  Br. 8-9.

In *Miller*, the Second Circuit used the substantial contacts test to supplement and limit *Coplan*'s effects-based reasoning, and courts elsewhere have followed suit in applying *Coplan* narrowly (if at all).  For example, in the recent decision of *United States v. Fortenberry*, 89 F.4th 702 (9th Cir. 2023), federal agents based in Los Angeles, California, interviewed the defendant in Nebraska, and at his lawyer's office in Washington, D.C., in connection with an investigation regarding illegal campaign contributions that were said to have occurred in Los Angeles.  The defendant was tried and convicted of making false statements by a jury in Los Angeles.  On

appeal, he contended, *inter alia*, that the district court erred in denying his motion to dismiss for improper venue.  The Ninth Circuit agreed that venue in Los Angeles was improper.

Like the government here, the government in *Fortenberry* urged the court to find that a Section 1001 violation "occurs not only where a false statement is made but also where it has an effect on a federal investigation."  *Id.* at 704.  The Ninth Circuit rejected this effects-based argument, explaining that the text of Section 1001 "plainly identifies the essential conduct of [the offense] to be the making of a false statement."  *Id.* at 706 ("It is the act of uttering a false statement that is the criminal behavior essential to liability under Section 1001").  The court explained that in concluding that venue could include "any district in which the effects of the false statement were felt[,]" the district court "went a step further to hold that materiality was also an essential conduct element" of Section 1001 because in its view materiality depended on how a listener perceived the utterance and where that listener was located.  *Id.* (internal quotation marks, alterations, and citations omitted).  The court explained, however, that venue "turns on the action *by the defendant* that is essential to the offense, and where that specific action took place."  *Id.* at 707 (emphasis added).

In focusing on the defendant's actions, rather than on the effects of that conduct, *Fortenberry* criticizes *Coplan*'s holding that venue in New York was appropriate where false statements were made in Tennessee because "'[p]roving the materiality of [the defendant's] false statements in Tennessee necessarily requires evidence that those statements were conveyed to or had an effect on the IRS investigators working in the Southern District of New York'" without explaining why "that is 'necessarily' so[.]"  *Id.* at 708 (quoting *Coplan*, 703 F.3d at 79).  *Fortenberry* thus makes plain that *Coplan* should be applied with great care, lest the government be permitted to establish venue anywhere one of its agents decides to travel with a defendant's

9

statement—a rule that, in a vacuum, is inconsistent with the Second Circuit's post-*Coplan* cases such as *Miller*, that focus on the substantial contacts test.

Finally, the government fails to respond to Ms. Bardakova's argument that in addition to a lack of venue, Count Three must be dismissed because the alleged false statements (that Ms. Bardakova never communicated with Mr. Deripaska directly, had not assisted Ms. Voronina with a birth or sent money, and had never visited Mr. Deripaska's properties in the U.S.) are immaterial on their face insofar as they do not relate to a matter within the jurisdiction of the executive branch of the United States government.  Br. 9.  The government also does not explain how, as a Russian national whose dominant language is not English, Ms. Bardakova could have acted "knowingly and willfully," where the Indictment does not allege that federal agents obtained an interpreter or confirmed that Ms. Bardakova spoke English.

Given these multiple deficiencies, the absence of any connection between Ms. Bardakova's conduct and New York, and the risk of hardship and prejudice to Ms. Bardakova, the Court should dismiss Count Three for improper venue.

## II.    The Court Should Dismiss Count One Because It Violates Due Process

As Ms. Bardakova established in her opening brief, the majority of the allegations in the Indictment that relate to Count One concern "making arrangements for a non-sanctioned person to give birth in the United States, and criminalizing this innocent activity violates the due process requirement of fair notice."  Br. 9-10.  Moreover, as Ms. Bardakova explained, the limited additional alleged conduct (involving gift and t-shirt deliveries) does not save the Indictment because due process also protects against the extraterritorial application of the law.  Br. 10.

The government responds first by asserting that "Count One alleges a straightforward four-year conspiracy pursuant to which Bardakova agreed to help Deripaska employ a U.S.

citizen to perform services for Deripaska in violation of sanctions, which was unlawful on its face." Gov. 30.  The government's argument, however, distorts the Indictment's allegations. The government cites paragraph 19 of the Indictment in support of its contention, but paragraph 19 does not say, as the government now claims, that "Bardakova agreed to help Deripaska *employ a U.S. citizen to perform services* for Deripaska in violation of sanctions."  Gov. 30 (emphasis added).

If anything, the Indictment alleges (at least concerning the alleged birth-assistance) that it was Ms. Shriki who helped to employ or advise Ms. Bardakova, rather than the other way around, for example, by stating that "SHRIKI *advised* BARDAKOVA on these tasks [related to the second birth], sending BARDAKOVA the addresses of the hospital used for VORNINA's first birth, the apartment address, the name of the doctor, and advice on how to use a realtor," Indictment ¶ 19(j) (emphasis added), or that Mr. Deripaska employed Ms. Bardakova *and* Ms. Shriki and relied upon them separately.  For example, the Indictment alleges that "DERIPASKA, by and through BARDAKOVA, SHRIKI, and other associates, organized and funded this endeavor [related to the first birth]," Indictment ¶ 19 (d); "SHRIKI and BARDAKOVA coordinated with various companies and individuals," Indictment ¶ 19(e); and "DERIPASKA arranged for SHRIKI, BARDAKOVA, and VORONINA to obtain a U.S. passport and U.S. birth certificate for DERIPASKA's child," Indictment ¶ 19(h).  The Indictment's actual allegations thus do not show, as the government would have it, that Ms. Bardakova assisted Mr. Deripaska in employing Ms. Shriki for various purposes.

The government also argues that "[a] person of ordinary intelligence would reasonably understand that a statute prohibiting a sanctioned oligarch from obtaining services from a U.S. person [presumably Ms. Shriki] and providing funding to that U.S. person means what it says."

Gov. 30.  This argument fails not only because the Indictment does not allege that Ms. Bardakova helped Mr. Deripaska "obtain[] services" from Ms. Shriki, but also because it attempts to sidestep and ignore Ms. Bardakova's primary argument, that is, that the actual allegations in the Indictment concern helping an *unsanctioned* person (Ms. Voronina) and her unborn child.  A person of ordinary intelligence overseas would have no reason to understand at all, much less reasonably understand, that helping an unsanctioned woman give birth could amount to a crime.  In this regard, Ms. Bardakova's opening brief highlighted how no case or published guidance states that making arrangements for an unsanctioned woman to give birth can amount to a criminal violation of the Ukraine-Related Executive Orders or 31 C.F.R. § 589.201, Br. 12, and the government has ignored this point, offering no cases or public guidance to rebut that argument.

The government also fails to grapple with how, after excluding the conduct relating to Ms. Voronina's pregnancies, the remaining attenuated allegations in the Indictment could sustain the extraterritorial reach of the United States criminal law.  The government argues broadly that Ms. Bardakova helped funnel money to Ms. Shriki "to pay for various services" for Mr. Deripaska "post-sanctions," but the only examples of such "services" the government highlights in its brief are the acts of "selling Deripaska's music studio in the United States" and "buying goods for Deripaska's personal use."  Gov. 30 (citing Indictment ¶¶ 19 and 19(f)).  The government's argument once again distorts the text of the Indictment.

As to the music studio, contrary to the government's argument in its brief, the Indictment does not allege that Ms. Bardakova was involved with the sale in any way.  Instead, the relevant paragraphs of the Indictment allege that Ms. Shriki alone handled the music studio sale: "*SHRIKI facilitated for DERIPASKA's benefit the sale of a music studio in California*," Indictment ¶ 1

(emphasis added); "*SHRIKI* facilitated the sale of a music studio in Burbank, California (the 'Music Studio') for the benefit of DERIPASKA, who owned and controlled the Music Studio through a series of corporate entities," Indictment ¶ 19(a) (emphasis added); and "*SHRIKI* failed to produce certain communications regarding facilitating the sale of the Music Studio and making purchases for DERIPASKA," Indictment ¶ 20 (emphasis added).

As to the purchase of "goods for Deripaska's personal use," which are alleged to have been flower and gift deliveries and purchases of t-shirts and iPhones, the Indictment suggests that all of those occurred while Ms. Bardakova was outside of the United States. *See* Indictment ¶¶ 19(b)-(c). As Ms. Bardakova established in her opening brief, due process does not allow for such spare claims to sustain the extraterritorial reach of United States criminal law because "'there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair.'" *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003) (quoting *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir.1990)). There is no such nexus between flower and gift deliveries and purchases of clothes and phones, nor has the government asserted otherwise in its opposition brief.

The Court should dismiss Count One because it seeks to criminalize innocent conduct and improperly applies U.S. criminal law extraterritorially, all in violation of due process.

### III.    The Court Should Dismiss Count One Because the Vast Majority of the Alleged Conduct Is Exempted from IEEPA, and the De Minimis Remaining Conduct Cannot Support the Charge

As Ms. Bardakova established in her opening brief, IEEPA exempts "the vast majority of Ms. Bardakova's alleged conduct, and the handful of allegations that are not exempted occurred overseas and do not provide an adequate basis for the extraterritorial application of U.S. law." Br. 13. Specifically, 50 U.S.C. § 1702(b)(4) ("Section 1702(b)(4)") provides that the President

cannot regulate or prohibit, directly or indirectly:

> any transactions ordinarily *incident to travel to or from any country*, including importation of accompanied baggage for personal use, *maintenance within any country including payment of living expenses and acquisition of goods or services for personal use*, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

Br. 14.  The plain text of Section 1702(b)(4) exempts the majority of Ms. Bardakova's alleged activities, as they involved planning for Ms. Voronina's travel and maintenance with respect to giving birth to her children.

In the government's response, it first directs the Court to conduct that Ms. Bardakova did not argue was exempted, but rather that Ms. Bardakova argued did not save the Indictment for other reasons.  The government highlights (again) Ms. Bardakova's supposed "assistance" to Mr. Deripaska in "selling a music studio," Gov. 33, which fails because it is an act that the Indictment nowhere attributes to Ms. Bardakova.  The government also highlights Ms. Bardakova's alleged work "purchasing and sending gifts on behalf of Deripaska," Gov. 33, and acquiring property from the United States for Mr. Deripaska's personal use (presumably t-shirts, flowers, and the like), which all fails because that conduct took place while Ms. Bardakova was overseas.

When the government finally attempts to address Ms. Bardakova's argument head on—the argument that Ms. Bardakova's actions in helping an unsanctioned woman give birth were exempted—the government asks this Court to endorse an unprecedented and crabbed reading of Section 1702(b)(4).  In particular, the government asks the Court to conclude that the relevant transactions here that were incident to Ms. Voronina's travel to the United States were not "transactions ordinarily incident to travel" because they had the trappings of luxury and involved "a private hospital birth, a two-story penthouse for six months, and at least six dedicated nannies

and housekeepers." Gov. 34. Nothing in Section 1702(b)(4) prevents it from reaching expenses just because they are large ones. That is, nothing in Section 1702(b)(4) suggests, for example, that a *shared* hospital room for a birth would be exempted, but a "*private* hospital birth" would not be. Nothing in Section 1702(b)(4) suggests that having *one* nanny is exempted as incident to travel, but supposedly having *six* crosses some unspecified line. The reality is that the expenses that are "ordinarily incident to travel" will necessarily vary depending on the economic circumstances of the individual travelers, and the government's suggestion that the exemption somehow excludes high-end expenses flies in the face of the plain text of Section 1702(b)(4), which says nothing of the sort.

The plain text of Section 1702, to the contrary, expressly limits the President's authority to regulate travel expenses, including the payment of "living expenses and acquisition of goods or services for personal use." 50 U.S.C. § 1702(b)(4). Section 1702 is divided into two parts: Section 1702(a), which specifies the activities the President may regulate, and Section 1702(b), which provides the exceptions to the President's authority to regulate certain activities. Specifically, Section 1702(a) states that "the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise," regulate certain specified transactions involving foreign countries and foreign nationals. *See* 50 U.S.C. § 1702(a)(1)(A)-(C). Section 1702(b), by contrast, enumerates four categories of excepted activities, explaining that "[t]he authority granted to the President by [Section 1702(a)] *does not include* the authority to regulate or prohibit, directly or indirectly[,]" those activities. One category of excepted activity is "*any* transactions ordinarily incident to travel to or from any country," including but not limited to the "payment of living expenses and acquisition of goods or services for personal use." 50 U.S.C. § 1702(b)(4) (emphasis added). Thus, the plain text of Section 1702(b)(4), read

in conjunction with the text of Section 1702(a), confirms that the President *may not* regulate transactions relating to an individual's living expenses while traveling. The government asks this Court to assess which living expenses fall within the exemption, but the government's argument runs headlong into the text of Section 1702(b)(4), under which the President has no authority at all to regulate such transactions.

Further, the government ignores many of the obviously exempted activities referenced in the Indictment. For example, the Indictment alleges that Ms. Bardakova helped with transactions relating to Ms. Voronina's flights, which the government overlooks, but which obviously qualify as transactions ordinarily incident to travel to or from any country. *See* Indictment ¶¶ 19(e), (j), and (m). The Indictment also alleges that Ms. Bardakova acquired housing and medical arrangements for Ms. Voronina—clearly "goods or services for personal use." Br. 14; *see* Indictment ¶¶ 19(e), (k), and (l).

The Court should dismiss Count One because Section 1702(b)(4) safeguards the vast majority of Ms. Bardakova's conduct as alleged in the Indictment, and the de minimis remaining conduct cannot support an IEEPA charge.

**IV.    The Court Should Address this Motion On the Merits Notwithstanding the Fact that Ms. Bardakova is in Her Home Country Rather than in the District**

**A. Ms. Bardakova is Not a Fugitive**

As established in Ms. Bardakova's opening brief, she does not fit the definition of either a traditional or constructive-flight fugitive, and thus should not be disentitled from making this motion. "She did not 'flee' the District in which she was charged," nor has she "avoided or refused to travel to the United States." Br. 18-19. Instead, Ms. Bardakova simply has "remain[ed] at home," in the country in which she has been continuously living for her entire life. *United States v. Cornelson*, 595 F. Supp. 3d 265, 271 (S.D.N.Y. 2022) (quoting *United*

*States v. Bescond*, 24 F.4th 759, 772 (2d Cir. 2021)).

In opposition, the government argues that Ms. Bardakova "qualifies as either a traditional fugitive or a constructive-flight fugitive" because she "was approached by law enforcement in the middle of actively committing the charged conduct" and "left [the U.S.] knowing she had just committed additional crimes by lying to the FBI, and before she could be charged." Gov. 16. The government's narrative, however, bears scant resemblance to what actually happened (including according to the Indictment): Ms. Bardakova spoke with the FBI agents in California when they approached her, allowed them to follow her back to her hotel where she willingly answered their questions, provided the agents with two cell phones (as apparently called for by a subpoena that is not mentioned by the Indictment), and then returned to her home country. No indication exists or is alleged that she left the U.S. for some improper reason, as the government contends, rather than because she does not live here and had no reason to remain.

The government relies on the fact—absent from the Indictment—that it supposedly "served her with a subpoena from a grand jury in the Southern District of New York" that "required Bardakova to appear before the grand jury in Manhattan." Gov. 8. The government later admits, however, that "[i]n lieu of appearing before the grand jury," Ms. Bardakova "provided two cell phones to FBI agents." Gov. 8. In other words, as often happens, FBI agents appear to have allowed Ms. Bardakova to fulfill the entirety of her obligations under the subpoena by "provid[ing] two cell phones" instead of— "[i]n lieu of"—appearing in New York, and Ms. Bardakova appears to have taken agents up on that offer. This course of conduct— which the government relies upon—demonstrates why Ms. Bardakova is *not* a fugitive, in that it shows she wished to satisfy any obligations under the subpoena immediately so that she could return home, rather than have to remain in the United States. Indeed, the Indictment itself notes

that Ms. Bardakova was truthful in admitting to FBI agents that "she had traveled to the United

States to facilitate arrangements for VORONINA to give birth in the United States."  Indictment

¶ 22.  When it became clear that Ms. Voronina was not going to be permitted entry into the U.S.

to give birth, Ms. Bardakova had no other reason to remain in the country.

Ms. Bardakova is not a fugitive.  She simply returned to her home country and has

remained there.  *See* Br. 19; *see also Bescond*, 24 F.4th at 773 ("[I]f the doctrine were to be

expanded to reach someone . . . who stays at home abroad, without concealment or evasion,

Congress, not the courts, should weigh the competing issues and values and determine whether

such an expansion is warranted.").  The government exaggerates the supposedly "extensive ties

to the United States" (again not present in the Indictment) in Ms. Bardakova's past, but ignores

and does not respond to the assertion that Ms. Bardakova is now at home, and fails to present any

reason why Ms. Bardakova would have to come to the U.S. in the future.  In these circumstances,

Ms. Bardakova is not a fugitive.

### B.  Policy Considerations Weigh Against Disentitling Ms. Bardakova

Because Ms. Bardakova is not a fugitive, the fugitive disentitlement doctrine does not

apply to her, but even if it did, disentitling her would not serve the purposes of the doctrine.  *See*

Br. 19-22.  The four purposes of the fugitive disentitlement doctrine are: (1)  "assuring the

enforceability of any decision that may be rendered against the fugitive;" (2) "imposing a penalty

for flouting the judicial process;" (3) "discouraging flights from justice and promoting the

efficient operation of the courts;" and (4) "avoiding prejudice to the other side caused by the

defendant's escape."  *Bescond*, 24 F.4th at 773-74.  None of these purposes would be served by

disentitling Ms. Bardakova.

The government first contends that Ms. Bardakova's "circumstances are entirely

different" from the defendant in *Bescond*.  Gov. 19.  Not so.  Like Bescond, Ms. Bardakova is

alleged to have committed the vast majority of the offense from abroad, has "no reason to travel to the United States" in the future, had no reason to remain in the U.S., and has no "residence, immigration status, job, or family in this country." *Id.* at 774. A handful of visits to this country, which included a five-year gap, does not make Ms. Bardakova a "regular[] travel[er] to the United States[.]" Gov. 10. Instead, "[o]ther than to avoid a ruinous designation as a fugitive," Ms. Bardakova has "no reason to travel here[,]" making disentitlement "too harsh a means of ensuring mutuality[.]" *Bescond*, 24 F.4th at 774.

Second, the government contends that "applying the doctrine here would rightly impose a penalty for Bardakova's flouting the judicial process." Gov. 20. As explained in Ms. Bardakova's opening brief and above, however, "Ms. Bardakova is a Russian citizen" who has no reason to travel to the United States other than "to have the opportunity to clear her name," which presents a significant financial and familial barrier to obtaining justice. Br. 20. She has not been "refusing to return for approximately 15 months (and running) since being charged." Gov. 20. She is simply remaining in her home country and taking care of her family, such that no penalty is warranted.

Third, the government contends that, "[u]nlike Bescond," Ms. Bardakova "personally committed crimes while located in the United States, targeted the United States sanctions regime from Russia . . . and through the subordinate, helped Deripaska conduct a wide panoply of unlawful conduct in the United States[.]" Gov. 21. In so arguing, however, the government has highlighted that Ms. Bardakova was not in the United States for much of the charged conduct. Contrary to the government's assertion, Ms. Bardakova's alleged crime is similar to Bescond's in that it is not "inherently a United States-based offense[.]" Gov. 17. The key allegations against Ms. Bardakova are that she violated U.S. sanctions laws by supposedly aiding a

sanctioned individual—or rather, his apparent girlfriend—while herself living in Russia.  These allegations are akin to how Bescond was alleged to have violated the U.S. Commodity Exchange Act while working at a bank in France.  *Bescond*, 24 F.4th at 763.  Similarly, as in *Cornelson*, Ms. Bardakova's last visit to the U.S. was years before the alleged scheme took place, she "did not act for a criminal organization," and her "home country protects [her] from extradition," all factors which the Court considered in finding disentanglement inappropriate.  595 F. Supp. 3d at 273.  Any potential deterrent effect of disentitling Ms. Bardakova "outweigh[s] the countervailing harm to the judicial process, which seeks to resolve cases on the merits whenever possible."  *Id*. (quoting *Bescond*, 24 F.4th at 774).

Finally, the government contends that "Bardakova's fugitive status works considerable prejudice against the Government."  Gov. 22.  The government does not explain, however, how that is so when it has already arraigned Ms. Shriki, Ms. Bardakova's co-defendant, and that case is proceeding apace.  Further, it was the government that elected to file the Indictment publicly at a time when multiple defendants remained overseas, ensuring that the government would obtain press coverage and notoriety for its efforts, while at the same time avoiding having to litigate in this Court the defects in the Indictment, including its obviously defective venue and IEEPA allegations.  The "countervailing prejudice" of disentitlement is thus much greater for Ms. Bardakova, who faces the impossible choice between leaving her family for an unknown period of time while expending considerable financial resources "regardless of her guilt or innocence" to litigate here, on the one hand, or else remaining in Russia and allowing a defective Indictment to stand, on the other.  *Bescond,* 24 F.4th at 775.

The Court should adjudicate Ms. Bardakova's motion on the merits.

## <u>CONCLUSION</u>

For the foregoing reasons, and those set forth in the opening brief, the Court should

dismiss the Indictment with respect to Ms. Bardakova.


Respectfully Submitted,

Dated: New York, New York
       January 24, 2024

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.

By:    /s/ Robert J. Anello
       Robert J. Anello
       Brian A. Jacobs
       Courtney D. Morphet
       565 5th Avenue
       New York, NY 10017
       Tel: (212) 856-9600

       *Attorneys for Defendant Natalia Bardakova*